Butler, Administratrix, etc., vs. The Milwaukee & St. Paul R. W. Co.

BUTLER, Administratrix, etc. vs. THE MILWAUKEE AND ST. PAUL RAILWAY COMPANY.

| | |
|---|---|
| 28 | 487 |
| 74 | 258 |
| 74 | 518 |
| 28 | 487 |
| 77 | 256 |
| 28 | 487 |
| 85 | 606 |
| 28 | 487 |
| 89 | 194 |
| 28 | 487 |
| 92 | 112 |

RAILROADS—NEGLIGENCE. (1, 2) *Care required of railway trains crossing highways; division of trains.* (3, 4) *Contributory negligence.*

REVERSAL OF JUDGMENT. *Refusal of correct instruction; when not ground of reversal.*

PRACTICE: *Rule as to printed case, on appeal.*

1. Since the business of railway companies involves great risk to human life, especially in running trains across highways in populous places, the law requires of them the utmost care.

2. Where a train, in passing through a populous village, was cut in two, and the ten rear cars, being separated from the ten front cars and engine by a distance of fifteen or twenty rods, while running across a public street, struck and killed plaintiff's intestate, there being no person on the front car of said rear section on the look-out for and ready to warn persons approaching, and no flagman at the crossing: *Held*, that these facts were evidence of gross negligence on the part of the company.

3. When the engine and first section of cars passed the street, deceased was standing at the head of his horse, harnessed to a buggy, about seventy-seven feet from the track, facing towards the rear section, but with his horse's head and neck intervening. The horse endeavored to escape, and in the effort to hold him deceased was drawn upon the track, and killed by collision with the rear section of cars. *Held*,

(1.) That if he actually saw the cars approaching, he was chargeable with contributory negligence in thus getting upon the track.

(2.) That it was not error to refuse an instruction to the jury, that "if he saw the cars approaching, *or might have seen them by looking*," he was guilty of negligence. It was for the jury to determine whether, under all the circumstances of the case, it was negligence in him not to apprehend the approach of such detached cars, nor look for them.

(3.) That this court, upon the facts stated, cannot say, against the verdict, either that the deceased did see the cars approaching, or that he was chargeable with negligence in not seeing them.

4. The fact that deceased incurred great risk *from his own horse*, while lawfully endeavoring to prevent its escape, is not proof of negligence on his part such as will discharge the railroad company from liability. He took that risk, but not a risk arising from any negligence of the company, that was unknown to him. *Rothe v. Railway Co.*, 21 Wis., 256, distinguished.

5. The refusal of an instruction correct in itself, is not ground for reversal, where the finding of the jury negatives every fact upon which it was predicated.

6. The rule of this court requiring that the printed case contain a "brief abstract" of the return of the clerk, etc., must be enforced. Hereafter, when the full phonographic report of the trial is printed, the court will not hear it read by counsel, and will not read it in the consultation room.

7. The phonographer's report, or return of the clerk, may be referred to by folios, and will be examined for the purpose of correcting mistakes or omissions in the printed case, or verifying the statements of counsel; but not otherwise.

APPEAL from the Circuit Court for *Rock* County.

Action, under the statute, to recover for injuries inflicted upon the plaintiff's intestate, causing his death. In the village of Milton is a large, level square, open at the time of the accident, bounded on all sides by public streets. The defendant's railroad runs across the middle of this square, in a line nearly east and west; and the distance across the square, including the width of the streets on the east and west sides, is about 586 feet. The depot stands upon this square, near its east side, and south of the track. The principal stores of the village are north of the track, on the east side of the street (running north and south) which bounds the square on its eastern side. From the east side of this street to the depot is about ninety-three feet; the depot itself is 100 feet long; and 129 feet west of the depot, and upon the south side of the track, is a water-tank. On the street above mentioned, and about seventy-five feet from the track, is a drug store. Shortly before the accident happened, Butler, the plaintiff's intestate, was in this store, and his horse, attached to a buggy, was hitched to a post in front of said store, with his head towards the railroad track. At this time a freight train on the defendant's road approached the square from the west; and Butler, hearing the whistle of the locomotive, stepped out of the store to his horse, and stood by his head, facing the horse and also facing the approaching train. This train con-

sisted of a locomotive, nineteen freight cars, and a caboose. The ten forward cars were destined for Chicago, the rest for Milwaukee. When the locomotive was just west of the public square, it and the first ten cars were detached from the other cars, the conductor remaining on the hind part of the train, and the two brakemen on the forward part. The train crossed the square in two parts, the distance between them gradually increasing; and when the second or rear section reached the street on the east side of the square, the evidence, as understood by this court, shows that it was separated from the hindmost car of the first or forward section by a distance of some twenty rods. The forward section passed on to a switch, some distance to the east of the square, where the ten cars connected with the locomotive were put upon a side track. Butler's horse stood still, with Butler at or near his head, until the forward part of the train was crossing the street, when he broke loose, jumped and attempted to turn to the west, and Butler, from the east side, caught and attempted to hold him. In this struggle Butler was drawn upon the track; the horse, which had turned itself partly round toward the right, was struck on the left shoulder and knocked down, falling on the north side of the track; and Butler fell between the rails, was caught by the brakes and dragged some six feet, and, in attempting to extricate himself, was run over and killed.

On the trial of this action, after proof of the foregoing facts, the defendant moved the court for a nonsuit, which was refused. Subsequently the court charged the jury, in substance, that the plaintiff, to entitle herself to recover, must establish two facts: first, that the deceased came to his death by the direct negligence of the railway company; and secondly, that he was himself free from any negligence that contributed directly thereto; that if it was true, as claimed by the plaintiff, that after the train was separated, either no person remained on the top of the cars in charge of the rear portion, but the same was left to run along the track until its momentum was exhausted, or, if

any person did remain in charge of it, he neglected all precautions to guard against accidents, by giving notice of the approach of the cars, or by stopping them at the proper point—then the defendant was chargeable with negligence; that if, on the other hand, as claimed by the defendant, the conductor remained on the rear end of the train, and on the top of the cars, and was constantly engaged in putting on the brakes and checking the motion of the train with reference to stopping at the depot, and if this portion of the train was in all respects managed with proper caution and prudence, and in the usual manner, then plaintiff could not recover; that the negligence which would render defendant liable was a want of reasonable care, and that reasonable care is that which men of ordinary prudence exercise in their own affairs under like circumstances. As to contributory negligence on the part of the deceased, the court charged that if Mr. Butler knew, or, had he exercised reasonable care, might have known, that the cars were approaching him, it was his duty to keep off the track, even though it might have been necessary to abandon his horse in order to do so; and if he voluntarily and rashly went upon the track, when he knew, or ought to have known, that the danger was imminent, then there could be no recovery; but if he did not know, and could not, by the exercise of reasonable care and prudence, under all the circumstances, know that the train was approaching, or if, knowing that fact, he was unable to retreat or to stay his progress and keep off the track, then negligence could not be imputed to him. No exceptions were taken to this charge.

At defendant's request the court further instructed the jury, that if the deceased was guilty of any want of ordinary care, however slight, which contributed directly to the injury, plaintiff could not recover; that defendant had a right to run and operate its train in the manner usual and customary on railroads, using a proper degree of care and caution in so doing; that it had a right to cut the train in two, and run one part to the switch and the other part to the depot, stopping the front

cars of that part on the crossing east of the depot a reasonable time for the transaction of its business at the depot, and it was not necessary that there should be a bell or whistle on the hind part of the train to give notice of its approach.

The following instructions, asked by the defendant, were refused: "2. If the deceased saw the approaching train, or could have seen it by looking, it was negligence on his part to go in front of it. 3. The hitching of a high-spirited or fractious horse within seventy feet of a passing train, was an act of carelessness that proximately led to the injury. 4. Butler, having had his attention called to the approaching train, and having taken his position by his horse to attend to him, was bound to use his eyes and other senses to avoid danger. And as there was no obstruction to prevent his seeing the whole length of the train, he was bound to observe that it was approaching in two parts, in the manner it did approach, and keep out of the way of it; and his failure to do so was a want of ordinary care, which directly contributed to the injury. 5. If the mind of the deceased was occupied by something else than the approaching train, that did not excuse him from using care and diligence to avoid a collision with the train. 6. If the deceased, when in no danger of personal injury, chose to attempt to restrain his horse at the risk of his life, and was injured in so doing, he must suffer the consequence of his choice. 14. It appears from the evidence that the conductor of the train was on the rear portion of the train, attending to the brakes, and you are not at liberty to find the defendant guilty of negligence on the ground that there was no one on that part of the train. 15. There is no evidence of want of proper care on the part of the defendant, to warrant the jury to find a verdict for the plaintiff, and I therefore instruct you to return your verdict for the defendant. 16. If the deceased came to the conclusion that he could, by holding on to his horse, turn the horse, and get him off the track before the approaching

train reached him, and miscalculated, the fault was his, and the plaintiff cannot recover."

Verdict for the plaintiff, for $3,000 ; new trial denied ; and defendant appealed from a judgment on the verdict.

*John W. Cary*, for the appellant, to the point that the deceased was evidently guilty of contributory negligence, and therefore the court erred in refusing a nonsuit, and also in refusing a new trial, cited *Rothe v. Railway Co.*, 21 Wis., 256 ; *Achtenhagen v. Watertown*, 18 id., 331 ; *Wilds v. R. R. Co.*, 24 N. Y., 430 ; *Steves v. R. R.*, 18 id., 422 ; 1 Redf. on R. W., 545, note, and cases there cited; *Langhoff v. R. R.*, 23 Wis., 43 ; *Carroll v. R. R.*, 13 Minn., 30 ; Sherm. & Redf. on Negligence, sec. 488, and notes, and cases there cited. Counsel also contended that there was no evidence of negligence on the part of the defendant.

*I. C. Sloan*, for respondent, to the point that defendant was guilty of negligence in running the rear portion of its divided train without any signal or warning to travellers approaching the street crossing, cited *Brown v. N. Y. C. Railway Co.*, 32 N. Y., 599. To the point that in determining whether the deceased had acted in a reasonably prudent manner, regard must be had to the peculiar circumstances in which he was placed, he cited *Mil. & Ch. R. R. Co. v. Hunter*, 11 Wis., 160 ; *Schmidt v. Mil. & St. P. Railway Co.*, 23 id., 186 ; *Langhoff v. M. & P. du C. R. R. Co.*, 19 id., 489.

DIXON, C. J. This is one of those actions, now so frequent, for injuries caused by negligence, in which the principal questions are, whether there was any evidence of negligence on the part of the defendant to go to the jury, and whether the evidence also showed that the party injured was free from fault, or did not contribute by his own want of care to the injury complained of. The difficulties presented by these questions have been often experienced by the courts. "I cannot help feeling" says BRETT, J., in *Smith v. L. & S. W. Railway Co.*, L. R., 5 C. P., 102, "that great difficulty is thrown upon the

judges who are called upon to determine questions of this sort, which make them too much judges of fact." KEATING, J., concurs in the remark. The present case is well adapted to illustrate its truth, especially so far as the latter question, or that of contributory negligence, is concerned; for upon that the case may be said to involve much uncertainty and embarrass-ment, there being no such preponderance of evidence or clear grounds of inference as to incline the mind with any undoubting assurance to either side. And in this instance the difficulties have been greatly aggravated by the manner in which the case has been presented to the court—by a false and vicious practice which, by the wrongful indulgence of the court, has of late become very common, and which henceforth must cease. The trial and proceedings below were reported by a professional phonographer, and his report, containing every word, question and answer which was spoken on the trial, has been printed as and for the "case" in this court. These professional reporters may serve a very good purpose at the circuit—we have nothing to say about that,—but they serve a very bad purpose in this court, if such is the way causes are to be prepared and presented for argument here. The rule is explicit, that the printed case "*shall contain a brief abstract* of the return of the clerk," &c. Rule 8 of this court. The search for the "two grains of wheat hid in the two bushels of chaff" has become most tiresome and repulsive to the members of this court; and that kind of labor can be no longer endured. Let the phonographer's report be returned to this court, if parties will, but the printed case should only contain the testimony of witnesses, so far as it is material, reduced to narrative form, and condensed as required by the rule. In the brief of the learned counsel for the defend-ant is found a statement of facts sufficiently full and at large, and with one or two execptions correct, which is comprised in two printed pages, or about nine folios. The testimony of the witnesses, that is, all the material parts of it, reduced to narra-tive form and given in their own words, would not have ex-

ceeded ten printed pages, or about forty folios. Instead of this we have one hundred and seventeen pages, or three hundred and ninety-eight folios of printed matter, nine-tenths of which is worse than useless. It serves only to distract and annoy. We make these remarks not to censure counsel in this case—far from it; and not because this case differs from others which are so reported; but because it is just like all of them. The files of the clerk are swelled, and his pigeon-holes filled with such voluminous trash, and the practice should have been long since corrected. It reflects upon this court as much and more than upon counsel engaged, that the evil should so long have been permitted; and it is the design of these observations to remedy it. It must henceforth be understood that the rule will be enforced, and that cases prepared as this has been cannot be read at the bar, nor perused by the judges in consultation. The phonographer's report or return of the clerk may be referred to by folios, and will be examined for the purpose of correcting mistakes or omissions in the printed case, or verifying the statements of counsel, but not otherwise.

The plaintiff rested her case, and the defendant moved for a non suit on the ground that the plaintiff had shown no negligence on the part of the defendant tending to produce the injury, and because the deceased was guilty of negligence which directly contributed to it. The motion was denied, and the exception taken by the defendant raises the question whether there was any evidence to go to the jury upon these two points. As to the first, we are free to say there was such evidence, not merely of negligence on the part of the defendant, but of a kind which should more properly be denominated gross or criminal negligence. The danger to human life from cutting a train into two parts, and running the rear part on to or over a street crossing in a populous town or village, without signal or warning to passers upon the street, is scarcely if anything less than that caused by cutting it into three parts, or making a "running switch," as it is called, under like circumstances, which was

characterized as gross and criminal negligence by the court of appeals, in *Brown v. N. Y. C. R. R.*, 32 N. Y., 597. The train here was divided west of the public square, and more than 35 rods distant from the street crossing where the injury took place, the locomotive with the first ten cars passing on through the square and over the street crossing with undiminished, or at an increased speed, whilst the remaining ten cars, or detached portion, moving more slowly, reached the crossing, and the two foremost cars passed over it, at the distance of twenty rods, or thereabouts, behind the last car of the first section of the train. The plaintiff's intestate was caught and run over by those two foremost cars at the crossing, and immediately killed, just as that portion of the train was being brought to a stand, with its centre nearly in front of the depot. In the statement of facts by the defendant's counsel, the distance between the two parts of the train is represented as much less; but in this we think he is mistaken. Four witnesses for the plaintiff, Davidson, Sanborn, Schwartz and Watts, concur in the statement that when the last car of the first section passed the street crossing, the distance was from 15 to 18 rods. Davidson and Schwartz say eight or ten cars, the length of a car being thirty feet. Sanborn says that the head of the detached portion or rear section of the train was near the water tank; it might have been half way between the water tank and the depot. This was from twelve to fifteen rods from the crossing. Watts locates the head of that section beyond or west of the water tank, and more than 15 rods distant. The other witnesses for the plaintiff did not observe and do not attempt to give the space or distance between the sections, except the witness Greenman. He says they were a car and a half or two cars apart at the water tank. But in this he must be mistaken, for he is contradicted by the conductor himself, who was a witness for the defendant, and probably much the best judge of distance in such cases. He was asked: "Do you recollect, when you passed the water tank, how the two parts of the train were with respect to each other;

what difference there was between them?" *Answer:* "I did not notice. I was setting up a brake *just before* we got to the water tank, and that took my attention from the forward end. I looked *before that,* and they were only three cars apart. I was setting a brake at that time, and did not take any notice of the forward part of the train." And the statements of the plaintiff's witnesses are further directly corroborated by the testimony of the brakeman Radcliffe, who, from the top of the rear end of the hindmost car of the first section, witnessed the deceased Butler's struggles with the horse, and looked and watched with intense interest until he saw them struck by the car, and Butler fell down or was drawn under and lost to his view. He testifies that he was ten or twelve cars distant when he saw the train strike the horse and the man. This testimony of the witnesses both for the plaintiff and defendant, and which is not otherwise contradicted, very clearly establishes, we think, that the distance between the two parts of the train at the time the last car of the first section passed the crossing, and when . Butler's horse started, and when the collision took place, was at least that above stated.

There was some conflict of testimony as to whether there was any person upon or in charge of the rear half train, by which the deceased was struck and killed. On the side of the plaintiff seven witnesses, who saw the transaction, testified very positively that they saw no person, and that there was no one on that part of the train. All were looking at it as it came up, and some with a view of hailing the conductor or other person in charge, in case he was seen. On the other side, the conductor, one brakeman, the engineer, fireman, station agent and one other witness, testified to the very opposite, and that the conductor was there taking charge of and setting the brakes so as to bring the cars to a stop at the proper place at the depot. The court instructed the jury (to which instruction the defendant took no exception), that if they found that "the conductor remained upon the rear end of the train, and on the top of the cars, that

he was constantly engaged in putting on the brakes, and checking the motion of the train with reference to stopping at the the depot, and that this portion of the train was in all respects managed, controlled and conducted with proper caution and prudence, and in the usual manner," then, that "the defendant is not chargeable with negligence, and the plaintiff cannot recover in this action." Under this instruction the jury must or might have found that the conductor was not on the top of the cars, and not constantly engaged in putting on the brakes, etc., and otherwise managing the train as described in the instruction. They need not necessarily have found, as contended by counsel for the defendant, that he was not on that portion of the train at all. He may have been there, but in the caboose (which was the hindmost car), or elsewhere, so that he was not seen and was not at his post of duty, watching and controlling the motion of the train in such way as to avoid collisions with and injuries to persons passing along the street; and if the jury did so find, then clearly it cannot be said that the verdict is entirely unsupported by evidence, or even that it is contrary to the weight of evidence.

But were the case otherwise, and the verdict in this respect unsustained by evidence, still there was other proof upon which, if properly submitted, the jury could not have failed to find negligence on the part of the defendant. There is no dispute, if the conductor was on that part of the train, as it seems most probable he was, that he was the only person on it, and that he was not at the front of it, but several cars back, at least three or more, when it approached the crossing, and was not in position to see whether any person was passing upon or near the crossing, or to give warning, or to check the motion of the cars, so as to prevent a collision. This, we think, was gross carelessness on the part of the railway company. If trains are to be divided in this way, and run by sections across the streets of populous towns and villages, the least that can be required of the company is, that there should be some suitable person at

the forward end of the foremost car to notify and warn people passing along the street, and likewise the man at the brakes, that he may set them in order to avoid collision; and it might not be unreasonable, in such cases, that a flagman should be required at the crossing as a further security against danger. Common prudence, and the most ordinary care, would dictate that at least the former course should be pursued, and all experience demonstrates the necessity of it. "The common law," as the authors of the treatise on negligence very correctly observe, "has a peculiar regard for human life; and for this reason exacts a greater degree of care in respect to it, than in relation to any matter of mere property. Accordingly, the law requires from all persons, including those who render gratuitous services, at least ordinary care for the safety of life; from those who render service for compensation, *great care;* and from *those whose business or occupation necessarily involves great risk of life,* it demands a peculiar degree of vigilance and sagacity, sometimes called *the utmost care.* The killing of a human being by culpable negligence being a criminal offense, it is obvious that the law in civil cases ought to follow the criminal law, and even to go beyond it; so that there is a manifest propriety in its punishing, civilly, a low degree of the same negligence which in a little higher degree it would punish criminally. Moreover, upon the principle already stated, that ordinary care means the degree of care taken by men of ordinary sense and discretion to avoid injury to their own interests, it being plain that such men would, where their own lives are at risk, use a degree of care which, in respect to anything else, would be considered very great, it follows that a like degree of care in respect to the lives of others is required from all men who, under similar circumstances, but with mere property interests at risk, would be bound to use ordinary care." Shearman and Redfield on Negligence, § 24. See also, *C. & N. R. R. Co. v. Sweeney,* 52 Ill., 325.

It is not necessary to say that the business or occupation or these railway companies is necessarily attended with great risk

of human life, especially under circumstances like those shown in the present case, and that the utmost care should be required. This is shown by the learned authors above quoted, and the authorities cited in § 477. And the reason for these precautions, for requiring some person at the head of that part of the train which has thus been cut off, or a flagman at the crossing, or both, appear in the opinion of the court of appeals above referred to. "A person approaching a crossing and seeing an engine with a large number of cars attached passing rapidly by, would naturally suppose that the danger of collision had ceased. His eye would follow the receding train, the noise of which would be apt to drown that made by approaching cars." And surely nothing could be more natural. Probably not one person in hundreds, not conversant with this mode of switching, as but very few are, and not knowing that it was practised at the place, would hesitate to walk or drive upon the track after the engine and cars had passed, without in the least suspecting the secret and noiseless danger to which he was exposed. The attention being directed to the engine and cars attached, it would seldom occur to any one to turn and look for cars silently approaching by their own momentum. The writer of this opinion remembers with a shudder, how, under like circumstances, a collision and probable death were with difficulty prevented by the presence and warning of the brakeman upon the top of the approaching car. Had there been a brakeman here, to have seen and warned Butler as the cars approached the crossing, or a flagman stationed at the crossing, it is altogether probable his life would have been saved.

The question of contributory negligence on the part of the deceased, or of the evidence upon this point as to which the jury have found there was no negligence, is, as already observed, one of much more difficulty. The deceased was standing by the head of his horse as the engine and first half of the train passed the crossing, and in plain sight of the last half, with which he subsequently collided ; that is, there was noth-

ing to obstruct his vision, had he cast his eyes in that direction. Just as the engine and that part of the train passed the crossing and went out of view east of it, the horse becoming frightened, probably at some object near—the team which drove up —broke loose from the post to which he was hitched, and, struggling and jumping to free himself from the deceased, who held him by the head, both were conducted, or propelled as it were, along the street to the crossing, where they came in contact with the foremost of the detached cars, just as that portion of the train reached the crossing, and the deceased fell or was drawn under and killed. If, as contended for the defendant, the deceased saw that part of the train, as he might have done, and knew its approach, and yet voluntarily and rashly went upon the crossing, or suffered himself to be drawn there in his effort to prevent the escape of the horse, it seems clear that it was negligence on his part, which should prevent a recovery. The court below distinctly so charged, but the jury found in the negative, or that he did not see and had no knowledge of the approach of the cars, and that there was no want of reasonable care on his part in not knowing or ascertaining their approach. If the opposite had been the finding of the jury, it is very improbable that the verdict could have been disturbed. But they having found as they did, the question now is, whether the verdict must not stand. The deceased stood by the horse, facing the railway track, and distant about 77 feet from the place of collision. He was upon the side of the horse opposite that whence the cars were approaching. The head and neck of the horse might possibly have partially obstructed his view. His attention was doubtless fixed upon the locomotive and that part of the train which passed directly before him. The other section of the train was, as we have seen, at that time, from 15 to 20 rods in the rear, and some distance from the crossing. Had that section followed the other so closely that the eye, in losing sight of the latter, would naturally have caught sight of or been directed to the former, then it might

reasonably be presumed that the deceased must have seen and known of its approach. But at the distance by which the two parts were separated, the presumption seems now hardly reasonable, if indeed it be not the other way. And when it is remembered that just as the first section passed in front of him the horse started, and the struggle commenced in which the unfortunate man lost his life, the presumption is very greatly weakened that he ever knew or was conscious for a moment of the approach of other cars until he was struck by them, and it was too late for him to save himself or guard against the calamity. Upon this point, therefore, although not free from doubt, we are inclined to express our satisfaction with the verdict of the jury, and to say upon the evidence, as they have said, that the deceased had no knowledge of the danger to which he was exposed. And this conclusion is further supported by that universal love of life and strong natural impulse to save one's self in the face of a known danger, which must have prompted the deceased to abandon the horse and not to offer himself a useless and certain sacrifice. At all events, the question was peculiarly one of fact, to be found by the jury from all the circumstances; and unless we can say there was no evidence and nothing in the circumstances proved to uphold their finding, the verdict must stand. *Langhoff v. M. & P. du C. Railway Co.*, 19 Wis., 497; Shearman & Redfield on Negligence, § 11.

And upon the other branch of the question, whether the deceased was guilty of negligence in *not* having known or ascertained the approach of the cars, it seems equally difficult to say that the verdict was incorrect or should be set aside. It would have occurred to but very few, and it might with safety be affirmed, to no ordinarily cautious and prudent man, under the circumstances, to have looked, if time and opportunity had permitted, for the approach of cars as those cars were approaching. The deceased, not knowing and having no reason to anticipate their approach, was acting as most men of ordinary care and prudence would act in like situation. He was en-

deavoring to prevent the escape of his horse, so long as there was hope in such effort, and but for the unforeseen and unexpected approach of the cars, through the negligence of the railway company, it does not appear that he was incurring any especial risk in so doing. He had just seen the train pass, drawn by the engine in the usual course, and naturally supposed he might go upon the track with safety. Absorbed, too, in his efforts to stop the horse, he doubtless had no time to look for other cars moving along the track. No man would have thought of doing so. He was suddenly overtaken by a misfortune, an accident, in the breaking away of his horse, and was prudently endeavoring to avoid the consequences of it. Negligence implies some act or conduct in itself wrongful, under the circumstances—the wrongful doing or omission to do that which reason and prudence would suggest in the then situation of the party. Situated as the deceased was, it was not wrongful in him to make every effort he was capable of to stop the horse, consistent with a proper regard for his own safety; and if, from all circumstances as they appeared to him, and as he might reasonably suppose them to be, he believed he could do so, it was not negligence to make the attempt, even though believing he might possibly not succeed, or might receive an injury from that cause alone. That risk he took, but not the risk of injury from the negligence of others, of which he had no knowledge, and which he had no adequate means of ascertaining or guarding against. The rule of law in respect to the use of care, the absence of which constitutes negligence, is that it must be reasonable care, adapted to the circumstances of the case. *Todd v. Railroad Co.*, 7 Allen, 207 ; *Goodale v. Worcester*, &c., 102 Mass., 406. So far as the deceased was concerned, therefore, the collision was purely acccidental. A sudden change of circumstances, an emergency which to him was inevitable, prevented his seeing the approaching cars as others around him could do. It was mere misadventure or unavoidable accident on his part, and negligence on the part of the

company, which produced the injury. It is for the protection of those who thus, by mischance or otherwise, and without fault on their part, are unable to protect themselves, that the obligation of care and diligence is imposed by the law on others not so disabled. If a traveller by carriage, upon a stormy day, when it is customary to have the carriage top extended, and health and comfort require it to be, should approach a crossing as Butler did, and, seeing the engine with a large number of cars attached pass by, should drive upon the track and be caught or struck and injured as Butler was, could negligence be imputed to such traveller so as to defeat an action for the damages sustained? It must, we think, to say the least of it, be very doubtful whether it could be, and, should a jury return a verdict against the company, whether such verdict could be set aside. But the present is a much stronger case. Here the deceased was governed by no motives of comfort or convenience, and not by any general custom or habit of people, in not looking out for the approach of other cars. A paramount and unyielding necessity forbade and restrained him. From the moment the horse started he could not use his eyes, if he would, for his own protection. It was his misfortune, but not his fault that this was so.

The case nearest like this, in some particulars, is that of *Rothe, Admr., v. M. & St. P. R. R. Co.*, 21 Wis., 256. But there the deceased was walking upon the private grounds of the railway company, and not upon a highway or street crossing, which makes all the difference in the cases. He had no legal right to be where he was, and besides was familiar with the location of the track, and the frequent use made of it by the company in allowing loose or detached cars to run over it (the latter fact and the fact that the deceased was struck by one of those cars not being stated in the report). In that case, therefore, the deceased voluntarily deprived himself of sight, and partially of hearing, too, under circumstances of known danger, or where it was most reasonable he should have apprehended it. Here,

however, the facts are reversed. The vision of the deceased was not voluntarily lost to him, but involuntarily and by accident, without his fault. He was no trespasser upon the lands of the company, but was in a public highway, where he had lawful right to go; and was not aware of his liability to injury, and had no reason to anticipate it.

The remaining exceptions relate to the several requests to charge made by the defendant, and which were refused. The general charge was regarded as sufficiently favorable, and was not excepted to.

The request numbered two, which was refused, was in these words: "If the deceased saw the approaching train, or could have seen it by looking, it was negligence on his part to go in front of it." This request was incorrect, or calculated to mislead the jury, in its second proposition: " or could have seen it by looking." The jury might, and undoubtedly would, have understood from this the natural or physical ability of the deceased to have seen the approaching cars had he looked in that direction—the fact that there was nothing to obstruct his view, which fact alone they were to consider in determining whether he ought to have seen them. The request, if granted, would have excluded from their consideration all the other facts and circumstances which tended to excuse or prevent the deceased from looking that way, and to show that there was no negligence on his part in not doing so.

There were no facts in the case to which the request numbered three was applicable, or upon which to rest it. There was no evidence in the case tending to show that the horse was either " high spirited or fractious," or accustomed previously to be scared or to run away, to the knowledge of the deceased, or of any one else.

The objections to the two next requests, numbered four and five, will sufficiently appear from the remarks already made, and further comment is unnecessary.

The logic of the sixth request was this. The deceased being

engaged in an attempt in itself perilous, and one which might have resulted in the loss of his life, therefore the defendant, its agents or servants, might lawfully kill him by an act of gross carelessness. It is conceded by the learned counsel, that the rescue of the horse was a worthy object, and the effort laudable; and this being so, it requires no argument to demonstrate the unsoundness of the proposition.

By the requests numbered fourteen and fifteen the court was asked to usurp the functions of the jury, and to declare what the evidence established upon one point, and what it did not establish, or that there was no evidence, upon another. It would have been clearly erroneous to have granted them.

The sixteenth request might, perhaps, with propriety, have been allowed. But of this we need not speak, since the jury by their verdict have negatived every fact upon which the request was predicated, and have found that the deceased had no knowledge of the approaching cars, and therefore could not have come to the conclusion that he could hold on to his horse and turn him so as to avoid a collision with them. If it was error, therefore, to refuse the request, it has now become an immaterial one.

*By the Court.*—Judgment affirmed.

LYON, J., took no part in this decision, the cause having been tried before him at the circuit.