HEDDLES, Respondent, vs. THE CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*March 20 — April 25, 1889.*

RAILROADS: *Injury to person at street crossing. (1) Duty to keep lookout. (2) Blowing of whistle. (3) Speed of train: Special verdict: Form of question. (4) Evidence admitted for one purpose but used for another. (5) Duty to have flagman or gate. (6) Instructions to jury. (7) Special verdict: What questions to be submitted. (8) Excessive damages.*

1. A railroad company is bound to provide for a careful lookout in the direction in which a train is moving in places where people, and especially where children, are liable to be upon the track.

2. The plaintiff, a boy about seven years old, was run over by defendant's engine at a street crossing in a city, at a point where he could have been seen from some distance by the engineer. The bell on the engine had been rung, but the whistle was not blown. A charge to the effect that the statute did not require the whistle to be blown at that place, but if the engineer, by the exercise of reasonable care and watchfulness, could have perceived that the plaintiff, in view of his tender years and his location and movements, was in danger of attempting to cross the track ahead of the engine, then he was under obligation to use every means in his power to prevent the injury, including the blowing of the whistle if that would have tended to prevent it,—is *held* not erroneous.

3. The statute (sec. 1809, R. S.) having provided that at such place no locomotive should go faster than six miles an hour, a question submitted for special verdict, as to whether the engine was " being run at a greater rate of speed than six miles an hour," was not objectionable in form.

4. The engineer having testified that the engine was running only from four to six miles an hour, and that he did not recollect hav-

ing stated that he was obliged to run faster than six miles an hour to do the work, evidence that he did so state, some time after the accident, was inadmissible except for the purpose of discrediting his testimony, and it was error to permit it to be used or treated in the argument to the jury as original evidence upon the question of the speed of the train.

5. A charge to the effect that though no statute or ordinance required a flagman to be kept or gate maintained at the crossing where the accident occurred, yet if the jury found that a flagman or gate was necessary to the safety of travelers on the street and would have prevented the injury in question, the failure to have such flagman or gate there was a fact from which they would be authorized to find negligence on the part of the company, was erroneous. The question submitted to the jury should have been whether, in view of the absence of flagman and gate, the engine was moved with prudence or negligence.

6. A charge that "the killing of a human being by culpable negligence being a criminal offense, it is obvious that the law in civil cases ought to follow the criminal law, and even to go beyond it, so that there is a manifest propriety in its punishing civilly a low degree of the same negligence which in a little higher degree it would punish criminally; but do not understand me by this that this is a case for punishment by giving exemplary damages"— criticised.

7. The form of a special verdict is very much in the discretion of the trial court, but only material and controverted questions should be submitted.

8. A verdict for $30,000 for an injury to a young boy necessitating amputation of both legs, is *held* excessive.

APPEAL from the Circuit Court for *Rock* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

This action is to recover for injuries sustained by the plaintiff while traveling along on Wall street, in Janesville, where the same is crossed by the defendant's railway tracks, on the afternoon of November 18, 1887, by being negligently and carelessly run over by a locomotive engine of the defendant, by reason of which he claimed $50,000 damages. The negligence and carelessness thus alleged related to the operating the engine, its unlawful rate of speed, the failure to blow the whistle or ring the bell, the absence of

Heddles vs. The Chicago & Northwestern R. Co.

guards or gates or watchman at the crossing, or any sign-board with the inscription "Look out for the Cars." The answer was a general denial and an allegation of contributory negligence on the part of the plaintiff.

At the close of the trial the jury returned a special verdict to the effect: (1) That the engine, as it approached the place of the accident, was being run at a greater rate of speed than six miles an hour, (2) without the whistle being blown, (3) and that such failure to blow the whistle directly contributed to produce the injury, (4) notwithstanding the engine bell was rung before and while the engine was crossing Wall street; (5) that there was no gate erected and maintained on Wall street, (6) although it was necessary for the safety of human life, and to protect from injury persons lawfully passing along that street, that a gate should be erected and maintained at that crossing, (7) and the failure to so erect and maintain the same directly contributed to produce the injuries in question, (6a) and in such failure the defendant was guilty of negligence, (6b) and such negligence contributed directly to produce such injuries; (8) that there was no flagman placed at that crossing to warn travelers of the approach of trains, (9) notwithstanding it was necessary for the safety of persons lawfully traveling that street that a flagman should be placed at that crossing; (9a) and the defendant was negligent in not placing a flagman there, (9b) and such negligence directly contributed to produce the injuries in question; (10, 11) but there was no ordinance of the city of Janesville requiring such gate or such flagman; (12) that there was no sign-board put up at said crossing with the inscription thereon, "Look out for the Cars;" (13) but such absence of such sign-board did not directly contribute to produce said injuries; (14) that at the time of such injury, the plaintiff was a bright, active, intelligent boy, for one of his age, (15) and comprehended that the crossing of the railway

track at that place was attended with danger, (16) but did not see the engine approaching the place of the accident before attempting to cross the track, (17) although shortly before attempting to cross he looked in the direction from which the engine approached; (18) but immediately prior to the time he started to so cross his attention was attracted by a train moving south upon the Chicago, Milwaukee & St. Paul track, at which he was then looking; (19) that when within twenty-five feet of the defendant's main track the plaintiff could have seen the coming engine at a distance of 250 feet south of him, (20) and the engineer in charge of the engine could have seen the plaintiff on Wall street, if standing within twenty-five feet of the main track, when the engine was 250 feet south of him; (21) that the engineer was about fifty feet from the plaintiff, when he first saw him, (29) and then the left portion of the plaintiff's body was turned towards the engineer; (24) and the engine at that time was on or near the center of Wall street; (22) and the plaintiff then was from two to three feet from the defendant's main track, (25) and walking towards it, (35) upon the planking for teams, (30) with his left side turned towards the engineer; (26) and at that time there was nothing in the action of the plaintiff which indicated to the engineer that the plaintiff was about to stop until the engine passed, before trying to cross himself; (28) and when the engineer saw that the plaintiff was about to cross the track he did all in his power to stop the engine and save the boy from injury; (27) and when the engineer first put forth any effort to save the plaintiff from injury he was just crossing the track; (33) that after the engineer attempted to arrest its progress the engine moved about thirty-five feet; (23) that when the plaintiff was struck by the engine he was from two to three feet south of the south side of the north sidewalk of Wall street; (31) that the defendant's employees were guilty of negligence or want of care which directly

contributed to produce the injuries which the plaintiff sustained; (31½) and such negligence or want of care consisted — *first*, in not keeping a proper lookout to see that the track was clear; *secondly*, in running at a greater rate of speed than six miles an hour; *thirdly*, in not blowing the whistle to warn the plaintiff of his imminent danger; (32) that the plaintiff did not in any respect fail to exercise ordinary care, which directly contributed to produce the injuries which he sustained; (34) that the plaintiff has sustained $30,000 damages by means of the injuries which he has received. The jury also returned the following general verdict, to wit: " We, the jury, find for the plaintiff, and assess his damages at the sum of ($30,000) thirty thousand dollars."

The defendant moved to set aside the verdict, and for a new trial, upon ten specific grounds unnecessary here to mention, which motion was overruled; and thereupon the trial court ordered judgment in favor of the plaintiff on the special verdict for the amount found by the jury. From the judgment entered thereon accordingly, with costs taxed at $620.99, the defendant appeals.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *F. C. Winkler.* To the point that to submit to the jury upon the testimony in this case the question whether a flagman should have been stationed at the crossing, and to assign his absence as negligence on the part of the company, was erroneous, they cited, besides cases cited in the opinion, *Telfer v. N. R. Co.* 30 N. J. Law, 188, 194; *State v. P., W. & B. R. Co.* 47 Md. 77; *Stubley v. L. & N. W. R. Co.* L. R. 1 Exch. 13; *Cliff v. M. R. Co.* L. R. 5 Q. B. 258; *Weber v. N. Y. C. & H. R. R. Co.* 58 N. Y. 451; *McGrath v. N. Y. C. & H. R. R. Co.* 59 id. 468; *Sutherland v. N. Y. C. & H. R. R. Co.* 9 J. & S. 17, 29; *Pakalinsky v. N. Y. C. & H. R. R. Co.* 82 N. Y. 424, 427; *Heaney v. L. I. R. Co.* 112 N. Y. 122.

For the respondent there was a brief by *Fethers, Jeffris & Fifield*, and the cause was argued orally by *O. H. Fethers* and *M. G. Jeffris.* To the point that the damages were not excessive, they cited *Schmidt v. M. & St. P. R. Co.* 23 Wis. 186; *Hemmingway v. C., M. & St. P. R. Co.* 67 id. 668; *Berg v. C., M. & St. P. R. Co.* 50 id. 419; *Schultz v. C., M. & St. P. R. Co.* 48 id. 375; *Louisville & N. R. Co. v. Roberts*, 8 S. W. Rep. (Ky.), 459; *Western & A. R. Co. v. Young*, 7 S. E. Rep. 912; *Solen v. V. & T. R. Co.* 13 Nev. 106; *Harrold v. N. Y. E. R. Co.* 24 Hun, 184; *Schultz v. T. A. R. Co.* 46 N. Y. Super. Ct. 211; *Topeka & S. F. R. Co. v. Moore*, 31 Kan. 197; *Funston v. C., R. I. & P. R. Co.* 61 Iowa, 452; *Quinn v. L. I. R. Co.* 34 Hun, 331; *Alberti v. N. Y., L. E. & W. R. Co.* 43 id. 421; *Ketchum v. T. & P. R. Co.* 38 La. Ann. 777.

CASSODAY, J. Pleasant street in Janesville runs southwesterly from what is known as the "lower bridge," for three blocks, and then turns and runs directly west across the tracks of the defendant and the Chicago, Milwaukee & St. Paul Railway, and then continues in the same direction to the city limits. The place of such crossing is at the junction of Pleasant and Madison streets, the latter of which runs directly north and south. The defendant's railway track at that point runs about thirty-five degrees east of north, and continues in that direction until it crosses the river; and for that distance the track of the Chicago, Milwaukee & St. Paul Railway runs right along on the westerly side of it. The western terminus of Milwaukee street commences at the junction of Pleasant and Madison streets, and runs about twenty degrees north of east, and across what is known as the "upper bridge." Immediately south of that street, and about half way from its western terminus to the bridge, is the Central school building. Wall street in question is the next street northerly from Milwau-

kee, and runs parallel to it from the river, or rather the race, to the place where it crosses Marion street, thence across the railway tracks mentioned, and then continues in the same direction until it intersects Pleasant street west of the railway. Such crossing of the railway tracks by Wall and Marion streets is the first crossing southerly from the passenger depots. The first crossing of the railway tracks northerly from those depots is by Academy street, running at right angles with Wall and Milwaukee streets. At that railway crossing the two companies were required by city ordinance to keep a flagman, to warn persons about to pass. The same is true of the Pleasant street crossing mentioned; but none was so required at the Marion and Wall street crossing. At that crossing the defendant had two or three side tracks on the easterly side of its main track; and the other company's main track was about eighteen feet westerly from the defendant's main track, and westerly from that it had two or three side tracks.

November 18, 1887, the plaintiff resided with his father on Pleasant street, about half a mile west of where that street crosses the railway, and had for a long time. He was on that day seven years, three months, and fourteen days old, and had been in the habit of attending the Central school mentioned, since the spring before. His more direct route to that school was by way of the Pleasant street crossing. Another boy, nine years of age, by the name of Callaghan, lived near where the plaintiff did, and was at that time going to the same school, in the same room, and to the same teacher. They were at school together on the day named. In the afternoon of that day the boys, including the plaintiff, spoke pieces. About 3 o'clock, or a little after, the plaintiff, with the Callaghan boy, started from the school and went to see his grandfather, who was at work near the river and a short distance north of Milwaukee street, to get some money from him

for having spoken the piece. From there the two boys started for home together, westerly along Wall street. There is evidence tending to prove that the two boys were on the southerly side of Wall street as they approached the railway crossing, and saw a St. Paul freight train up by the depot; that as they came to Marion street, or in that vicinity, they left the sidewalk on the southerly side of Wall street, and went northwesterly toward the other side of that street. Upon reaching about the middle of that street, and seeing the freight train approaching from the north on the main track of the St. Paul road, the Callaghan boy left the plaintiff, and ran westerly across the several tracks — passing about fifteen feet ahead of the freight train. The plaintiff testified, in effect, that just before the Callaghan boy started to run across the tracks he told the plaintiff to hurry up and they would get across before the other train came, but the Callaghan boy disclaims having made such statement or any statement at that time. Some of the witnesses testified to the effect that, as the freight train was crossing the street, the plaintiff motioned or waived his hand either to the men on the train or the boys, and continued to look in that direction. According to the plaintiff, he waited until the freight train passed over the crossing south, and then he, not seeing any engine or anything, started to go across, and was run over by the defendant's engine going north on its main track, as indicated in the findings of the jury. The plaintiff's right leg was completely crushed at the knee and the left one at the ankle, and the amputation of both necessarily followed soon after.

The calamity to the boy is sad to contemplate, but in this action at law the rights of the parties must be determined by the established rules of law. The jury found, in effect, that the negligence of the defendant's employees directly contributing to the injury consisted in not keeping

a proper lookout to see that the track was clear, in running at a greater rate of speed than six miles an hour, and in not blowing the whistle to warn the plaintiff of his imminent danger. These questions will be considered in their order.

1. "It seems to be pretty well settled that a railroad company must provide for a careful lookout in the direction that the train is moving in places where people, and especially where children, are liable to be upon the track. If they do not, and a person has been injured, then the company may, in the absence of contributory negligence, be held liable." *Townley v. C., M. & St. P. R. Co.* 53 Wis. 634; *Johnson v. C. & N. W. R. Co.* 56 Wis. 279. The jury found that those operating the locomotive could have seen the plaintiff anywhere within twenty-five feet of the track when 250 feet from him. The boy was quite young to be in the vicinity of such a crossing. This must have been manifest to any one who saw him there. Whether the keeping of such lookout was consistent with the failure of those operating the engine in not seeing the plaintiff until the locomotive approached the planking near the center of the street was a question involved in the case. As held in the cases cited, the question whether, under all the circumstances in this case, the persons in charge of the engine kept such careful lookout and acted as diligently as they should, was one of fact for the jury. 56 Wis. 283. Certainly we cannot say that the finding in that regard is not supported by evidence.

2. We find no substantial objection to the form of the question submitted to the jury as to whether the engine was at the time " being run at a greater rate of speed than six miles an hour." The question was undoubtedly put with reference to the statute, which provides that " in all cities and villages the engine bell shall be rung before and while crossing any street; and no train or locomotive shall

go faster, until after having passed all the traveled streets thereof, than at the rate of six miles per hour." Sec. 1809, R. S. The jury found that the engine at the time was being run at a greater rate of speed than six miles an hour. It is claimed that there is no evidence whatever to support such finding,— at most that there is only "a mere *scintilla* of evidence" to support it. One witness thinks it was running from four to five miles an hour; three from four to six miles an hour; and one that it was running about twenty miles an hour. Without attempting to point out the strength or weakness of any of this testimony, we shall assume for the purposes of this case that the evidence was sufficient to carry the question to the jury and hence to support their finding thereon. The jury having found that the engine bell was rung before and while crossing the street, that requirement of the statute cited is eliminated from the case.

3. The statute does not require the whistle to be blown in cities or villages. Sec. 1809, R. S. An ordinance of the city, in evidence, prohibited the sounding of the whistle within the "city limits, except as a necessary signal or to prevent accidents." This clearly contemplated that it might be sounded whenever it should become necessary as a signal or to prevent accidents. The jury found, in effect, that the engine approached the place of the accident without the whistle being blown, and that such failure to blow directly contributed to produce the injury. In charging the jury the learned trial court, after referring to the fact that the statute did not require the blowing of the whistle at the time and place in question, continued: "Still, it being the duty of the engineer to use every means in his power to prevent injury to the plaintiff at the crossing in question, if the injury could have been prevented by the blowing of the whistle, and the engineer had time to sound it after he saw the plaintiff was about to pass in front of the engine, and he failed to do so, in consequence of which the

plaintiff was injured while in the exercise of ordinary care, then your general verdict should be for the plaintiff. But if you should find that, after the engineer saw the plaintiff was about to attempt to cross the track, he was putting forth other exertions to save the plaintiff from harm, and had not time, on account of putting forth such other exertions, to have the whistle sounded, then his failure to do so would not constitute negligence on his part, and would not furnish a basis for the recovery of damages by the plaintiff. The engineer was only bound to put forth every reasonable effort in his power to save the plaintiff as soon as he discovered that he was about to place himself in a position of peril, and if the engineer did put forth such efforts he would not be guilty of the neglect of any duty."

It is claimed that in the light of this charge the finding of the jury upon this point "is not only wholly unsupported by the evidence, but is contrary to the finding of the jury itself that, as soon as he discovered that the boy was about to cross the track, the engineer did all that was within his power to prevent accident." Counsel here refers particularly to the twenty-eighth finding. They are all given above, and the respective numbers preserved, but arranged more with reference to their relation to each other. They should be read together. So read they are unobjectionable, especially in connection with the testimony of the engineer to the effect that, when the rear of the freight train passed, the cab of his engine was about twelve to eighteen feet south of the road planking on Wall street; that at about the time the front of his engine approached the planking near the center of the street he observed the plaintiff eight or ten feet away from the track, walking "slowish, with a kind of cautious step, on the sidewalk, facing toward the St. Paul train and partially" his engine, as he "could see his face looking apparently at all he saw coming;" that he naturally supposed he saw his "engine and this train and all, as

Heddles vs. The Chicago & Northwestern R. Co.

they were moving;" that he kept his attention on the boy, and about the time his engine had probably passed on this crossing six, eight, or ten feet, the "train slipped by his cab, letting the light come through from the west; at that instant this boy seemed to give a look, and took a square cut, and, instead of following the sidewalk, he ran directly in front of the engine;" that the second he saw the boy attempt to get across, he reversed his engine, and opened her, and the wheels turned back as lively as the steam could turn them, but the engine continued to go ahead; that he could do nothing else to prevent the injury "in that time." Although he differs with other testimony as to the location of the plaintiff and the direction in which he was going and looking, yet it is apparent from this testimony that he supposed the plaintiff saw his engine, and had no expectation that he would attempt to cross the track ahead of his engine, and hence made no effort to stop the train or give any warning except the ringing of the bell, until he discovered that the plaintiff was about to cross the track. In view of the tender years of the plaintiff, the direction in which he was going, and his nearness to the main track, especially as testified to by other witnesses, we are inclined to think the evidence sufficient to support the findings of the jury mentioned. Certainly the sounding of the whistle would have been more startling to the boy than the customary ringing of the bell. We fail to perceive any valid objection on the part of the defendant to the portion of the charge quoted.

At the close of the charge a juror, not exactly understanding this portion of the charge, stated to the court: " I think your charge was that the engineer would not be under any obligation to whistle until he actually saw the danger. *Court.* Not exactly that. Not until he saw, or by the exercise of reasonable care and watchfulness could have seen, that a person was in danger." Counsel insist that this

is an incorrect statement of the law; that "it states, in substance, that, if the engineer saw, or by the exercise of reasonable case and watchfulness could have seen, that a person was in danger, then he was under obligation to whistle." This reply of the court should, however, be considered in connection with the portion of the charge quoted, and another portion of the charge not quoted, covering the engineer's version of the location and action of the boy. So considered, and it seems to be to the effect that if the engineer, by the exercise of reasonable care and watchfulness, could have perceived that, in view of the tender age of the boy and his location and movements as testified to by the plaintiff's witnesses, he was in danger of attempting to cross the track ahead of the engine, then he was under obligation to use every means in his power to prevent the injury, including the blowing of the whistle if that would have tended to prevent it; or else he should have stopped the engine, as indicated in the general charge, as follows: "But the moment he, the engineer, saw, *or could have seen by the exercise of reasonable diligence,* that the plaintiff did not see the engine and was unheeding its approach to the crossing, it then became his duty to put forth every reasonable effort in his power to stop his engine and save the plaintiff from harm."

We have thus considered the questions of keeping a careful lookout, the speed of the locomotive, and the blowing of the whistle, because they are closely related to each other, and all pertain to the operating of the engine, and each is connected more or less closely with another ruling of the court which has given us all much serious consideration.

4. On direct examination the engineer testified that the locomotive was only running from four to six miles an hour at the time of the injury. On cross-examination by the plaintiff's counsel he testified, in effect, that he knew

W. H. H. Macloon; that he did not recollect having a con-
versation with him a night or two after this accident at the
corner of Main and Milwaukee streets, but recollected being
there one night; that he did not recollect stating to him at
that time that there was no use talking about six miles an
hour, that he could not do the work if he only ran six miles
an hour, and that he had to run faster; but that he would
not swear that he did not make that statement to Mr. Mac-
loon when talking about the accident. Mr. Macloon testi-
fied, in rebuttal, that some time in the winter after the
accident he had a conversation about the accident with the
engineer at the place mentioned, and that he then and there
stated, in substance, that "there is no use talking about six
miles an hour. We can't do the work if we only run at six
miles an hour, and we have to run faster." This evidence
was inadmissible, except for the purpose of discrediting the
engineer's testimony as to the speed of the train. *Stone v.
Northwestern Sleigh Co.* 70 Wis. 585; *Warder v. Fisher*, 48
Wis. 338. Such declarations of the engineer constituted no
part of the *res gestæ*, but were made long after the accident
in a casual conversation in no way connected with the en-
gineer's agency, and upon well-settled rules of law were
inadmissible, except for the sole purpose of impeachment,
as indicated. *Austin v. Austin*, 45 Wis. 523; *Randall v.
N. W. Tel. Co.* 54 Wis. 140; *Stone v. Northwestern Sleigh
Co.* 70 Wis. 587. For any other purpose such declarations
were mere hearsay. *Ibid.* Manifestly, it was admitted by
the court, against objection, for the specific purpose of so
discrediting the testimony of the engineer. Being admitted
for that purpose only, it could not be legitimately used for
any other purpose in the case. *Cayon v. Dwelling House
Ins. Co.* 68 Wis. 510. After the testimony was all in, coun-
sel for plaintiff, in arguing to the jury, said, in substance,
"that the railroad men would all swear that they never ran
trains over those crossings at a greater rate of speed than

six miles an hour," but that, "we all know that they do run faster than that, and that the company compels them to do that." Upon objection being made by the defendant's counsel, the following colloquy and rulings were had: *"Plaintiff's Counsel, Mr. Jeffris.* I stated what I did on the engineer's evidence in this case that he said to Mr. Macloon that the company compelled them to do it. I was speaking of the engineer's conversation with Mr. Macloon, in which he said, 'We had to do it,'—and that led substantially to the inference that the company compelled them to do it. *Court.* If I understand the force of your objection, you claim he spoke of railroad men generally. *Defendant's Counsel.* He said that all railroad men would swear that they never ran trains over those crossings at a greater rate of speed than six miles an hour, and that we all know that they do it. I object to those statements as outside of the evidence, and improper. *Plaintiff's Counsel, Mr. Jeffris.* The testimony is here in this case that they frequently ran over those crossings at a greater rate of speed than six miles an hour. *Court. There is some evidence tending to show that this engineer said, 'We can't do our work by running six miles an hour.' I will rule that Mr. Jeffris is not out of the record. Defendant's Counsel.* Then I will take an exception. *Court.* I will advise the counsel to discuss only the testimony before the court. *Plaintiff's Counsel, Mr. Jeffris, said further:* Gentlemen of the jury, they don't like to come to the scratch. Mr. Roberts *has admitted* here that he *did it frequently,* but when it comes to an issue of fact, where it becomes important in a lawsuit what it is, it is three to five, to the highest six, miles an hour. The railroad company doubtless figures that they will save enough in the course of five or ten years, by compelling them to run five or ten miles an hour,—that they will save enough in time,—to pay for a few of these human limbs mutilated and lives destroyed that the law limits to $5,000.

*Defendant's Counsel.* I note an exception to that harangue. I don't care very much about the effect of that; but I think this is becoming a disgrace to the court room, to indulge in that kind of argument,— of a railroad speculating in human lives and limbs. I think it is unbecoming, and unprofessional, and improper. *Court.* The objection is taken down on the part of the defense. *Defendant's Counsel.* There must be something more than that,— a ruling. *Court.* *I rule that Mr. Jeffris is not out of order.* To which ruling of the court the defendant's counsel then and there duly excepted."

These rulings of the court cannot be sustained, except on the theory that such declarations of the engineer so testified to by Macloon were admissible and admitted as original evidence in the case. Even if they were admissible as such original evidence, still we should be inclined to hold that such remarks of counsel went beyond the range of the declarations. But such declarations were not admissible, nor admitted, as such original evidence, for which purpose they would have been and were mere hearsay, and hence were not properly the basis of the argument indulged in by counsel. They could only be properly used in argument respecting the credibility of the engineer's testimony in regard to the speed of the locomotive. The ruling of the court, however, gave them the effect of admissions of a party; whereas the engineer, at the time and place of making the same, was not acting in the line of his agency and had no authority to make such admissions or to bind the defendant by any admission. Yet the ruling of the court left the jury at liberty to infer such excessive speed from such declarations merely. Such improper use of such declarations was upon a point material in the case,— the speed of the train; a point upon which the plaintiff's evidence, as it appears in this record, is certainly not very strong. It was, moreover, well calculated to unduly influence the jury on the subject

of damages.   Besides, as indicated, the question of the speed of the train is intimately connected with the vigilance of those in charge of the locomotive in keeping a lookout and giving timely signals of danger.   We must hold that such ruling of the court in allowing such remarks to be made was error.

5. The undisputed evidence shows, and there is no pretense to the contrary, that no gate was erected or maintained at the crossing in question, and that no flagman was placed there to warn travelers of the approach of trains. Each of these questions was, however, submitted to the jury; also questions as to whether the safety of travelers made either necessary; and whether the absence of either constituted negligence; and whether such negligence directly contributed to produce the injury.   The court charged the jury on these questions that " there is no statute of this state, or ordinance of the city of Janesville, commanding or compelling the defendant company to erect and maintain a gate or place a flagman at the crossing of Wall street; but if it has been proven on this trial, and you believe and find from the evidence given, that the crossing on Wall street at which the injury sued for occurred is of such a character that the posting of a flagman or the maintaining of a gate was necessary to the safety of travelers on such street and would have prevented the injury in question, *then the failure* of the defendant to post a flagman there *or* to erect and maintain the gate *is a fact tending to prove negligence and from which you would be authorized to find negligence.* . . . You have the right to determine from the evidence in this case whether the safety of the people traveling over this crossing made it the duty of the company to station a flagman there, and whether a failure on the part of the company to discharge this duty was negligence," and whether such negligence directly contributed to produce the injury.

The jury found each of these several questions in favor of the plaintiff and against the defendant. Such a verdict, rendered in pursuance of a similar submission, has been repeatedly reversed by the highest court in New York. *Beisiegel v. N. Y. C. R. Co.* 40 N. Y. 9; *Grippen v. N. Y. C. R. Co.* 40 N. Y. 41; *Houghkirk v. D. & H. Canal Co.* 92 N. Y. 219. In so far as the language of Mr. Justice PAINE in *Kinney v. Crocker*, 18 Wis. 74, seems to support a contrary rule, it is expressly disapproved in one of the cases just cited. That case, like the case of *Burns v. North Chicago R. M. Co.* 65 Wis. 315, is distinguishable from the case at bar, since in each of those cases a flagman had previously been kept at the *locus in quo* and then withdrawn without notice; and hence, in the last case cited, Mr. Justice ORTON said: " The traveler might in this way be lured into danger, when, if no flagman had ever been kept there, he would not have looked for such a signal, but would have looked and listened for other signs of an approaching train." In the more recent case of *Hoye v. C. & N. W. R. Co.* 67 Wis. 14, it is said: " Without committing ourselves upon the question as to whether, in the absence of any statute or ordinance upon the subject, a jury would be authorized to determine the necessity of a flagman, or to predicate negligence upon the mere absence of a flagman, yet we think the presence or absence of a flagman may be proved as an item of evidence to be considered by the jury in connection with all the other facts and circumstances in the case, upon the question of the defendant's prudence or negligence in moving the train at the time and place in question." The same rule prevails in New York. *McGrath v. N. Y. C. & H. R. R. Co.* 63 N. Y. 522. The true rule seems to be aptly stated by FINCH, J., in the later case from New York above cited, thus: " The fact [of the presence or absence of a flagman] may be proven as one of the circumstances under which the train was moved, and by which the degree of

Heddles vs. The Chicago & Northwestern R. Co.

care requisite in its handling and running may be affected, so that the question never is whether there should have been a flagman, or one ought to have been stationed at the crossing, *but whether, in view of his presence or absence, the train was moved with prudence or negligence.*" *Houghkirk v. D. & H. Canal Co.* 92 N. Y. 227. Similar views are entertained by other courts. *Haas v. G. R. & I. R. Co.* 47 Mich. 406; *Philadelphia & R. R. Co. v. Killips*, 88 Pa. St. 412; *Pennsylvania R. Co. v. Matthews*, 36 N. J. Law, 531; *Welsch v. H. & St. J. R. Co.* 72 Mo. 451; *Lesan v. M. C. R. Co.* 77 Me. 85; *Comm. v. B. & W. R. Corp.* 101 Mass. 201; *Guggenheim v. L. S. & M. S. R. Co.* 33 N. W. Rep. (Mich.), 167. We must hold that the exceptions as to such submissions and directions were well taken.

6. The questions submitted to the jury are very numerous. The statute requires that such questions shall relate " only to material issues of fact." Sec. 2858, R. S. In other words, such verdict, under the statute, is " necessarily limited to material and controverted questions of fact." *Davis v. Farmington*, 42 Wis. 431. Undisputed questions of fact do not constitute such material and controverted questions of fact; and hence the propriety of submitting such questions has frequently been doubted, and the refusal to so submit them frequently been sanctioned. *Hutchinson v. C. & N. W. R. Co.* 41 Wis. 553; *McNarra v. C. & N. W. R. Co.* 41 Wis. 75; *Williams v. Porter*, 41 Wis. 423; *Singer Mfg. Co. v. Sammons*, 49 Wis. 316; *Eberhardt v. Sanger*, 51 Wis. 72, and cases there cited. In the case at bar the absence of any flagman or gate was undisputed. The absence of any ordinance requiring such flagman or gate was undisputed. The absence of any sign-board with the inscription " Look out for the Cars " was undisputed. That the plaintiff was a bright, active, intelligent boy for one of his age, at the time he was injured, was undisputed.

The submission of so many undisputed facts, as though they were material and controverted questions of fact, could only tend to complicate the trial and confuse the jury. As indicated in the opinion last cited, such special verdict was not designed to elicit from the jury "an abstract of the evidence." As there said, the statute requiring the court to submit a special verdict to the jury "would seem to limit such questions to such facts as are controverted and put in issue by the pleadings, or, at most, to such as might properly have been put in issue by the pleadings, i. e., issuable facts in contradistinction to mere evidence." 51 Wis. 77. See also *Ault v. Wheeler & W. Mfg. Co.* 54 Wis. 304; *McLimans v. Lancaster,* 63 Wis. 603; *Pratt v. Peck,* 65 Wis. 471; *Atkinson v. Goodrich Transp. Co.* 69 Wis. 10. As indicated in some of these cases, the form of such verdict is very much in the discretion of the trial court. Nothing here said is intended to restrict a proper exercise of such discretion. Nor do we wish to be understood as saying that every submission of an undisputed fact would justify a reversal, but only to indicate the propriety of simplifying issues, and thus avoiding errors which in a close case may become *material* and hence ground for reversal.

7. The court charged the jury that, "the killing of a human being by culpable negligence being a criminal offense, it is obvious that the law in civil cases ought to follow the criminal law, and even to go beyond it, so that there is a manifest propriety in its punishing civilly a low degree of the same negligence which in a little higher degree it would punish criminally; — but do not understand me by this that this is a case for punishment by giving exemplary damages." This language is found in an opinion of Dixon, C. J., in *Butler v. M. & St. P. R. Co.* 28 Wis. 498, and was by him taken from an elementary work. But

it was not designed by him or its author as a guide to a jury in a case like this, if in any case. It may readily be perceived how such language, in a case like this, might tend to mislead and prejudice the jury, especially on the subject of damages.

8. The motion to set aside the verdict and grant a new trial was based in part upon the ground that the damages awarded were excessive. Of course there is a sense in which the damages awarded cannot be regarded as excessive. In this sense the learned counsel for the plaintiff is undoubtedly right in saying that, " though this supreme court room were filled with gold there is no rational human being in the state of Wisconsin who would change places with this boy, maimed as he has been by the negligence of the defendant, and accept the gold as compensation." Yet no one would for a moment contend that such is the legal measure of damages, even in a case like this. Courts and juries must deal with such questions in a deliberate and practical sense. Without going into any discussion of the subject, we are constrained to believe that from some misconception of duty, misdirection of the court, passion or prejudice, the jury awarded damages considerably in excess of what the plaintiff was entitled to recover in any event. It follows that the motion to set aside the verdict and grant a new trial should have been granted upon this ground; or else the same should have been allowed to stand upon condition that the plaintiff remit the unreasonable excess. We are asked by counsel to name such excess, but as there must be a reversal on other grounds it becomes impracticable to do so. Besides, the trial court has a much broader discretion in such matters than this court. *Corcoran v. Harran*, 55 Wis. 120; *Baker v. Madison*, 62 Wis. 150; *McLimans v. Lancaster*, 63 Wis. 609; *Murray v. Buell, ante,* p. 14; *Pratt v. Pioneer-Press Co.* 35 Minn. 251. We deem it unnecessary to consider any other

of the numerous questions raised for the guidance of the court upon a retrial.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.