CLARRIE A. APSEY, ADMINISTRATRIX, ETC., v. THE DETROIT, LANSING & NORTHERN RAILROAD COMPANY.

*Railroad companies—Injury at highway crossing—Contributory negligence.*

In this case it is held that in any view which can be taken of the testimony of the witnesses who saw the conduct of plaintiff's decedent, the substance of which is given in the opinion, it appears that he was not in the exercise of that care and caution which under the repeated decisions of this Court it was his duty to observe in approaching and crossing a railroad track.

Error to Ingham.   (Peck, J.)   Submitted on briefs October 31, 1890.   Decided December 5, 1890.

Negligence case.  Defendant brings error.  Reversed. The facts are stated in the opinion.

*R. · A. Montgomery,* for appellant, contended:

1. The case of *Brady v. Railroad Co.,* 81 Mich. 616, is strongly in point; and if the Court adheres to the well-settled doctrine that the plaintiff must show an absence of negligence upon the part of the decedent, the judgment in this case should be reversed. The testimony of the engineer bore directly upon the contributory negligence of the deceased, and it was undisputed; citing *Underhill v. Railway Co.,* 81 Mich. 43.

*Charles B. Lothrop,* for appellant.

*Frank L. Dodge* and *C. P. Black,* for plaintiff, contended:

1. No case should be taken from the jury when to do so will prevent their giving to either party benefits of any inferences which might be drawn from a comparison of all the facts; citing *Staal v. Railroad Co.,* 57 Mich. 240; and where the evidence tends to show actionable negligence on the part of the defendant, the case should be submitted to the jury; and in determining whether such is the tendency of the evidence, the testimony upon the subject on the part of the plaintiff must be taken as true; citing *Sheldon v. Railroad Co.,* 59 Mich. 172, and· cases cited.

CHAMPLIN, C. J.  At Meridian station, in Ingham county, where the railroad runs nearly east and west, there is a highway crossing the track, running north and south.  About 10 o'clock in the forenoon of July 7, 1888, an east-bound train that did did not stop at the station passed over the highway.  A man named James Apsey was riding in a top buggy drawn by a single horse along the highway, coming from the south of the track towards the north.  With him was his son, Willie, aged 11 years. They collided with the passing train, killing them both instantly.  For the death of the son, the plaintiff, who is his mother, brings this action as administratrix of his estate.

83 MICH—28.

From a point lying at the east of this highway crossing to a considerable distance west, the ground had been excavated for the road-bed of defendant's track. Some of the surplus earth was piled upon the company's right of way west of the highway crossing. In order to bring the highway to a grade with that of the railroad, the road-bed of the highway had been excavated a short distance south of the railroad. This excavation was from 2 to 4 feet in depth, and extended back from the railroad track a short distance. On the south side of the railroad track a ditch was excavated for the purpose of carrying off the water, and over this ditch the company had constructed a bridge of plank, all of which were 14 feet in length, running crosswise of the highway. On the west side of the highway, as it approached the railroad, there were obstructions which prevented a person passing along the highway at that season of the year from obtaining a view of defendant's track and cars approaching thereon, for a distance of some 12 or 15 rods south of the crossing to a point which was from 25 to 45 feet south of the track. The testimony is conflicting as to the exact distance from the track at which a person riding in a buggy could see a train approaching from the west, but there was not much if any conflict that a train might be seen approaching from that direction at or about the intersection of the defendant's right of way with the highway, which at that place was 45 feet south of the track. The view was obscured by buildings, an orchard, and the embankment before referred to.

The uncontradicted testimony of plaintiff shows that on the east side of the road stood the dwelling-house of one Rorback, and that Mr. Apsey, the driver of the horse, on approaching the railroad track on that occasion, in passing north, followed the usually traveled and beaten

track of the road until nearly opposite the Rorback house, and at that point the indications manifested by the track of his buggy showed that he turned to the right, and proceeded a short distance, and then curved into the road again, as if he had at first intended to turn around at that point; and, from the indications, he had proceeded on towards the railroad track until he came to a point near the bridge, before referred to, across the ditch, when he turned to the right, the wheel of the right-hand side of the buggy passing on the edge of the embankment, and the wheel upon the left-hand side leaving the bridge over the ditch at the east end, at which point the horse and wagon came in collision with the locomotive engine, the horse striking against the cylinder, and the plaintiff's husband and his son being thrown upon the driving-rod of the engine, causing, as before said, almost instant death to the father, and instant death to the son.

It is claimed on the part of plaintiff in the declaration in the case that the defendant was negligent, and that James Apsey, the driver of the horse, and his son, Willie Ray Apsey, were in the exercise of due care and caution, and that the injury resulted without fault or negligence on their part. The negligence of the defendant alleged in the declaration consisted in not giving the statutory signals required upon approaching a highway crossing, the obstruction of the view by the embankment, and in running its cars at too great a rate of speed past a point where the view of the track and train was thus obstructed. It appears that the deceased, James Apsey, resided at or near Meridian station, and was familiar with the highway crossing at that point; and defendant claims that the testimony in the case is conclusive that James Apsey was guilty of contributory negligence, and that therefore the plaintiff was not, under the declaration, entitled to recover.

Upon this point, four witnesses gave testimony in behalf of the plaintiff, and one in behalf of defendant.

The first witness called who saw James Apsey and his son at or about the time of the accident was Archie Glosser. He was standing by the fence in the grain-field 15 or 20 rods west of the crossing. He saw Apsey and his son as they were driving towards the track. He says that they were looking up the track—*west*—as if they were looking for the train; that he watched them until they got out of his sight in a kind of a bank that was there, and that they dropped down into what is called a "cut," and that was the last he saw of them. He saw the train after they had disappeared from his sight, and heard the danger whistle sounded. They commenced sounding the alarm whistle at about the time they were at the switch, and sounded all the way down to the crossing. He did not remember at what gait Apsey was driving, and could not tell whether it was fast or slow. He says he could see Apsey until he got within 15 or 20 feet of the crossing, and after that he could not see him.

The next witness was Mary Jane Williams. At the time of the accident she resided at Meridian station, in the house known as the "Williams House." It was situated on the south side of the railroad track, and fronted upon the highway, and faced east; the house itself standing a few feet south of defendant's right of way. At the time of the accident she was sitting in a room in the wing part of the house, which stands at the north of the main building. She saw Apsey and his son when they passed the house. She says they were not driving very fast, she thinks they were walking,—"just walking;" that Apsey and his son were looking to the west; that she heard the danger signal sound, and at that time they were right in

front of the house; that at the time the whistle sounded the train was coming from the west, and did not go by until Apsey and his son had ridden upon the crossing; that they got to the crossing at the same time the train got there.   They were driving on a slow gait,—a slow walk,—and continued to do so until they got clear to the train.

The next witness on the part of the plaintiff was Charles Slenou.   He resided at Meridian, and was 18 years of age at the time of the trial.   He was at the station at the time of the accident, July 7, 1888, and was loading a car with wood.   The car stood at the west of the railroad crossing.   He saw Apsey and his son approaching from the south.   They were south of the track, and the train had not yet reached the crossing.   They were at that time one or two lengths of the horse and buggy south of the crossing.   The cars passed between the car in which he was and the point where he last saw Apsey and his son. The horse was going north.   He saw the horse jump a little, sideways, and, after he had jumped, the back of the buggy was to him.   He estimates the distance he was from the crossing at 35 to 40 rods.

The other witness for the plaintiff was Amey Carr. She resided at Meridian, and recollects the circumstances of the killing and death of Mr. Apsey and his son.   She was standing in the south door of her father's house, which is north of the railroad crossing, on the east side of the highway.   She testifies that she saw Apsey and his son as they approached the crossing that day; saw the horse and vehicle; that it was not moving very fast, and was walking, as she thought.   She did not know how far the horse was south of the track when she heard the danger signal given, but she testifies it was not very far; that the horse must have been on the bridge, or near that, and was going towards the track at the time; that she

could not state exactly where he was. She was 18 years of age at the time of the trial. At the time she heard the danger signal she was sitting in the dining-room, a short distance from the door, trimming a hat. When she heard the signal she arose, and went to the door, and then saw Apsey. The horse was coming towards her, and was near the plank of the bridge; and at the same time she saw the engine pass the depot, which is situated on the opposite side of the street from Mr. Carr's house, and further to the south. She further testifies that she thinks the horse was upon a walk at the time she saw it, although she cannot be sure, as the horse was coming towards her.

These were all the witnesses who testified as to the conduct of Apsey on behalf of the plaintiff. One other person saw the accident, and that was the engineer upon the train, Charles A. Bigelow. He testified that he had been a locomotive engineer for 17 years, and over. He was asked, upon cross-examination by plaintiff's counsel, what he did when he first saw these parties at Meridian that morning, when they were killed by his engine. He testified that he pulled the alarm whistle; that to the best of his judgment he was at that time back from the crossing 300 feet; that when he first saw them, and gave this alarm, he thinks they were nearly opposite the fence running east and west,—they might have been a little further to the south of the fence; that he could see the carriage, and the man and boy in the carriage; that they were driving towards the track, and appeared to be looking towards him; that, at the time he saw them, they were going very fast; that the horse was running or trotting very much faster than a walk, but how much he could not state,—they were going very fast; that when he first saw them he gave the alarm by blasts of the whistle, he could not say how many times; that he was

sitting upon the right-hand side of his engine, and that Apsey and his son were approaching the track from the same side; that he endeavored to and did stop the train as soon as he could, using all the appliances at hand to do so; that, when he first saw Apsey on the day of the accident, he was making no attempt to stop his horse, as he could see, but he saw a motion of his hand as if he hit the horse with the lines, but, upon cross-examination, he was not sure whether Apsey, in raising his hand, did so for the purpose of whipping his horse with the lines, or whether he was about to make a move to escape from the buggy; that the last he saw of him was when the horse turned off, but whether he turned the horse to drive off in that direction, or the horse was frightened, and turned itself, he could not tell; that when he first saw them he should not think that they were in a place of danger, and, if the corner of the right-of-way fence was 45 or 46 feet away, they were in an apparently safe place; that he should think that a man might turn around there, but that he had never been up there; that, after he gave the danger alarm, the horse came down there; that whether he ran away down there, or whether they drove him down there, he came, and the horse was going fast. He further testified that when he first saw him, and gave the danger signal, he was a little south of the range of fence which bounds the right of way on the south of the company's grounds.

This is all the testimony there is in the case bearing upon the contributory negligence of the deceased. If, as the plaintiff's witnesses testify, the deceased, Mr. Apsey, the father, was driving upon that crossing upon a walk, and deliberately drove against the train at that gait, it would be such contributory negligence as would prevent recovery in this action; and if, on the contrary, he was driving his horse fast in an attempt to drive across the

track before the train reached the crossing, he was like-
wise guilty of contributory negligence, which should pre-
vent the plaintiff's recovery in this action.    There is no
testimony in the case showing that the horse was fright-
ened, or that an attempt to stop him was made to let the
train pass in front, and, in any view which can be taken
of the testimony of the witnesses who saw the conduct of
Mr. James Apsey, it appears that he was not in the exer-
cise of that care and caution which under the repeated
decisions of this Court it was his duty to observe in
approaching and crossing a railroad track.    This disposes
of the case, and no attention need be given to the other
errors assigned.

The judgment is reversed, and a new trial granted.

The other Justices concurred