ELIZABETH GROSTICK, ADMINISTRATRIX, ETC., v. THE
DETROIT, LANSING & NORTHERN RAILROAD
COMPANY.

*Railroad companies—Injury at crossing—Contributory
negligence.*

1. A person about to cross a railroad track is bound to recognize
   the danger, and make use of the senses of hearing and sight,
   and to ascertain, before attempting to cross, whether a train is
   in dangerous proximity. If he neglects to do this, and ventures
   blindly upon the track, it must be at his own risk, and such
   conduct should be pronounced negligence by the courts, as
   matter of law; citing *Railroad Co. v. Miller*, 25 Mich. 274;
   *Haas v. Railroad Co.*, 47 Id. 401; *Pzolla v. Railroad Co.*, 54
   Id. 273; *Rhoades v. Railway Co.*, 58 Id. 263; *Potter v. Rail-
   road Co.*, 62 Id. 22; *Mynning v. Railroad Co.*, 64 Id. 93;
   *Matta v. Railway Co.*, 69 Id. 109; *Freeman v. Railway Co.*,
   74 Id. 86; *Gebhard v. Railway Co.*, 79 Id. 586; *Underhill v.
   Railway Co.*, 81 Id. 43; *Guta v. Railway Co.*, Id. 291; *Brady
   v. Railroad Co.*, Id. 616; *Apsey v. Railroad Co.*, 83 Id. 432.

2. Plaintiff's decedent is held to have been guilty of such negligence
   in driving upon defendant's track as to preclude a recovery.

Error to Livingston. (Newton, J.) Argued January
7 and 8, 1892. Decided March 18, 1892.

Negligence case. Defendant brings error. Reversed.
The facts are stated in the opinion.

*Charles B. Lothrop*, for appellant.

*W. H. H. Russell*, for plaintiff.

[The authorities are fully reviewed in the opinions.—
REPORTER.]

LONG, J. The plaintiff had verdict and judgment in
the court below for $18,143.50. The action was brought

in the circuit court for Livingston county for the negligent killing of August Grostick, plaintiff's husband, on the afternoon of October 19, 1889, on a highway crossing just west of the station at Howell, on defendant's road.

The negligence alleged in the declaration is that defendant failed to sound its whistle or ring its bell continuously for at least 40 rods before reaching the crossing; ran over the crossing at a great rate of speed, the crossing being a dangerous one; and the employment of careless and incompetent servants.

The station at Howell is in the southern part of the town, at the extremity of a street known as "Cross Street." Defendant's road runs at right angles with this street. Next west of Cross street is one which ends at an elevator, and does not cross the railroad track; and the street next west of this is known as the "Pinckney Road" or "East Street," and crosses the railroad track, and is the one upon which plaintiff's husband was killed. There is another street still west of this, crossing the railroad, called "Walnut Street." The railroad runs nearly straight from the station, crossing these streets; and in crossing Walnut street turns more to the west, and at a distance of several hundred feet from Walnut street enters what is known as "Jewett Cut." The distance from Pinckney Road or East street to the east end or mouth of Jewett cut is 1,150 feet. East street crosses the railroad at an elevation of seven or eight feet above the natural surface of the ground, and from that point westward to the mouth of Jewett cut the railroad is upon an embankment of at least that height the entire distance. At a point 120 feet north of the railroad crossing on East street is the first house on the east side of that street, and from that point there is no obstruction to the sight for the entire distance along the railroad track west to the mouth of Jewett cut.

Plaintiff's intestate, about half-past 3 o'clock in the afternoon of the day upon which he was killed, was going from the village of Howell forward along East street or Pinckney road, driving a span of horses attached to a lumber wagon. He was alone, and riding upon a seat upon the wagon-box. When he had passed Mr. Sexton's house, 120 feet north of the railroad track, he could see the whole distance to the mouth of Jewett cut, as there was nothing to obstruct his view, and the track being elevated above the natural surface of the ground. Passing from Sexton's house to the track, there was no point at which he could not have seen the entire length of the railroad track to the mouth of Jewett cut. There was some obstruction to his view to the eastward, and he could not see the station of the defendant company until he had nearly approached the track, although plaintiff's counsel, in his brief, admits that the deceased could have seen eastward along this track towards the station when within 120 feet of the crossing. The train by which the deceased was struck was coming from the west, running at considerable speed, a little behind time; the time varying from 5 to 15 minutes, as testified by different witnesses. According to the testimony of plaintiff's witnesses the train was running from 25 to 30 miles an hour. There was testimony showing that the bell was not rung or whistle sounded for this highway crossing.

Upon the part of the defendant, it was contended that the bell was a steam bell-ringer, ringing continuously from station to station. Many persons upon the platform of the depot, who were waiting for the train and listening for its approach, testified that they heard the whistle blown just as the train was entering Jewett cut from the west. This is called the "station-whistle." There is no contention but that this whistle was sounded. This point

was some 1,400 feet west of the Pinckney-road crossing. The witnesses testified that the deceased was driving along on a slow trot, and some of them say that he appeared to be looking to the east.   He was familiar with this crossing.  As his horses reached the track the engine struck them, and Mr. Grostick and his horses were instantly killed.   The engineer of the engine was on the south side of the cab, and did not see the deceased, on account of the dome and sand-box and other things upon the engine.   The fireman was on the north side of the cab, and a part of the way from Jewett cut he was occupied in attending to his fire.   He says he saw the man approaching slowly, but did not anticipate danger, and thought he would stop, until he was within 25 feet of the track, when he says he saw him start up his horses, and he (the fireman) at once called to the engineer, "Whoa! Whoa!" upon which the engineer applied the air-brakes and reversed the engine.   The train was a heavy one, consisting of five cars, engine, and tender, and being 304 feet in length.

The only question which I shall discuss is whether there was any evidence to go to the jury showing or tending to show that the deceased was exercising due care in attempting to cross the railroad track in the manner and under the circumstances here stated.   It has been repeatedly held by this Court that a person about to cross a railroad track is bound to recognize the danger, and to make use of the senses of hearing and sight, and to ascertain, before attempting to cross, whether a train is in dangerous proximity.   If he neglects to do this, and ventures blindly upon the track, it must be at his own risk;   and such conduct should be pronounced negligence by the courts, as matter of law. *Lake Shore & M. S. R. R. Co. v. Miller*, 25 Mich. 274; *Pzolla v.*

*Railroad Co.*, 54 Id. 273; *Rhoades v. Railway Co.*, 58 Id. 263.

It was held in *Potter v. Railroad Co.*, 62 Mich. 22, that—

"It is the duty of all highway travelers [approaching a railroad crossing] to keep a due lookout; and, if they do not choose to heed what they ought to heed, they must bear the consequences."

In *Mynning v. Railroad Co.*, 64 Mich. 93, it was held by this Court that—

"A railroad track is a warning of danger to those who go upon it, and persons about to cross are bound to recognize the danger, and make use of the sense of hearing as well as of sight, and, if either cannot be rendered available, the obligation to use the other is the stronger, to ascertain, before attempting to cross, whether the train is in dangerous proximity; and if they neglect to do this, and venture blindly or carelessly upon the track, it must be at their own risk. Such conduct is of itself negligence."

This same doctrine is laid down by this Court in *Haas v. Railroad Co.*, 47 Mich. 401; *Matta v. Railway Co.*, 69 Id. 109; *Freeman v. Railway Co.*, 74 Id. 86; *Gebhard v. Railway Co.*, 79 Id. 586; *Brady v. Railroad Co.*, 81 Id. 616; *Guta v. Railway Co.*, Id. 291; *Underhill v. Railway Co.*, Id. 43; *Apsey v. Railroad Co.*, 83 Id. 432.

The trial court left the question of the contributory negligence of the plaintiff's intestate to the jury as a question of fact for their determination, stating to them:

"It becomes a question of fact for you to determine whether or not negligence exists on his part in attempting to cross, or whether he acted, under the circumstances, as a man of reasonable caution and prudence would have acted under like circumstances. If you find from the evidence that he did listen and look, and had no notice by sight or hearing, and if you find that no whistle was twice sounded, no bell rung, and that he had

no notice by sound of rumbling train, or smoke, and ventured to cross, and that, while crossing, his danger was seen or known by the employés of the defendant at a sufficient distance from the road crossing to enable them to slacken the speed of the train, or even to stop it, and that it was not done, that would be gross negligence on the part of the defendant in running its train, and it would not be thereby excused from liability."

Under the circumstances here stated, the court was in error in thus directing the jury. The deceased was a man 50 years of age, of good health, sound in mind and body, his hearing and sight not defective. He had lived just east of Howell for many years, and was thoroughly familiar with this crossing. Applying these facts to the rules of law heretofore laid down by this Court in the cases above cited, we think it was the duty of the court to have directed a verdict in favor of the defendant. The burden was upon the plaintiff to show, not only that the defendant was guilty of negligence in the premises,— a point which we do not deem necessary to discuss,—but that her intestate was exercising due care in approaching this crossing. Under the conceded facts in this case, when he was within 120 feet of the track he had a clear, unobstructed view of the track, every foot of the distance to the mouth of Jewett cut, until he passed upon the track. Apparently, he was looking eastward, and giving no heed whatever to a train approaching from the west. According to the testimony, he exercised no care whatever, but drove his team along without looking westward until he was struck and killed. This was such carelessness that his administratrix should not, as a matter of law, be permitted to recover.

We need not discuss the other questions raised. Upon the ground here stated, the judgment below must be reversed, and a new trial ordered.

MORSE, C. J., GRANT and MONTGOMERY, JJ., concurred with LONG, J.

MCGRATH, J. *(dissenting).*   Plaintiff's intestate was killed by an east-bound passenger train while he was attempting to cross defendant's track with his team at a street running north and south at right angles with defendant's track, 636 feet west of the station at Howell, known as "East Street."   The accompanying diagram will indicate the surroundings.

a—Depot.
b—Engine house.
c—Elevator.
d—Dwelling house.
e—Mouth of cut.
f—Dwelling house.

Decedent was driving south at about 4 o'clock in the afternoon of October 19, 1889.   The pilot of the engine struck between the horses and the front wheels of the wagon, instantly killing Grostick and both horses.   The defendant's right of way is filled in at this point from

6 to 8 feet, and the highway approaches are about 18 feet in width. The east-bound train emerged from a cut which is about 18 feet deep at the point E, about 1,500 feet west of East street. The westerly end of the cut is 3,024 feet westerly from the station, and about 200 feet north of the station line, so that the train is upon a curve from the time it enters the cut until just before reaching East street.

A number of witnesses testified that the train was 18 minutes late at Fowlerville, and that the train was moving at a very high rate of speed. Those who do undertake to fix the rate give it as from 20 to 45 miles an hour. The conductor says that they made the run from Fowlerville to Howell, 8½ miles, in 13 minutes, and made up 3 minutes of lost time. Nineteen witnesses say that they heard the station-whistle as the train approached. The engineer, fireman, and conductor say that the whistle was given at the entrance to the cut, 3,024 feet west from the station. Of these witnesses, nine were at or near the station looking for and expecting the train, and several of them say that they saw the steam escape as the whistle was given. Seven of them, including the conductor, engineer, and fireman, were on the train. Five witnesses heard no whistle, and 15 witnesses heard no crossing whistle and no bell, and the majority of them are positive that neither whistle nor bell was sounded. The fireman said that he supposed that decedent was going to stop his team, but, noticing that he did not, he (witness) called out "Whoa!" to the engineer, who said that he reversed just as he struck the horses, and the train was stopped opposite the elevator. Several witnesses testified that they heard the roar of the train, and a number of others said that the train made no noise. One witness, who was on East street, 35 rods south of the track, says:

"I was with Mrs. Ackley on that day. As we were coming in town, about 30 or 35 rods of the crossing, we saw a train coming; and we hadn't any more than said it when the train came and struck them. I did not hear any whistle or any bell. If there had been a whistle blown or a bell rung, I think I could have heard it. The train came in very fast, and made no noise whatever. I would not have heard it if I hadn't seen it."

Mrs. Ackley says:

"Miss Carlton was with me, coming north. We were riding along leisurely, and looked up, and saw the train coming. All we noticed, we saw a team coming upon the railroad,—a dark-colored team,—and the engine struck the team just as I saw the train. I did not hear any whistles nor any bell. I was about 30 rods south of the crossing, on the Pinckney road. If the whistles had been blown, it seems as if I could have heard it. My hearing is perfectly good. I can't give the exact time. It was between three and four. The train was coming, at the time it struck the team, at a good speed.   *   *   * I was, I think, about 30 rods south of the planing-mill. I looked up and saw the train coming. I heard no whistle and no noise of any kind. I didn't hear the roaring of the train at all. I heard nothing. We heard no whistle until after the gentleman was struck. After the horses were thrown over, they whistled and rung the bell; and we heard that, just before coming in the depot."

At the rate of speed that the conductor stated that the train made between Fowlerville and Howell, it would take the train about 20 seconds to make the distance between the mouth of the cut and East street. The testimony was that decedent had been driving at a "dog trot," but that the horses came to a walk before reaching the track. The horses were 5 and 6 years of age, and worth from $450 to $500; and the testimony is that they approached and entered upon the track as though they heard nothing. One witness, who was at the time of the collision north of decedent, on East street, said that decedent's back was towards the witness. Two witnesses

say that when struck, and just before going on the track, decedent was looking east, as though expecting a train. One witness, who lived north of the track, on East street, but whose place of business was south of the track, on East street, said that on hearing the whistle, while approaching the track from the north, it was difficult to tell from which direction the train was approaching. There was no obstruction west of East street, on the north side; and when at Sexton's house, which is 126 feet from the track, the train could be seen as it emerged from the cut. But, coming south on East street, there were obstructions,—the Sexton house, the elevator, the engine-house, and the station,—which partially obstructed the view to the east after reaching Sexton's house until defendant's right of way was reached.

Plaintiff had judgment, and defendant appeals; and it is urged that, as plaintiff's intestate could have seen the approaching train if he had but looked, consequently he is guilty of contributory negligence, and that the trial court should have directed a verdict for defendant.

Section 3375 of the statutes provides that—

"A bell of at least thirty pounds' weight, and a steam-whistle, shall be placed on each locomotive engine, and said whistle shall be twice sharply sounded at least forty rods before the crossing is reached, and after the sounding of the whistle the bell shall be rung continuously until the crossing is passed, under a penalty of one hundred dollars for every neglect: *Provided*, that at street crossings within the limits of incorporated cities or villages the sounding of the whistle may be omitted, unless required by the common council or board of trustees of such city or village; and the company shall also be liable for all damages which shall be sustained by any person by reason of such neglect."

1. The rule is well established that to warrant the court, in any case, in instructing the jury that the plaintiff was guilty of negligence, the case must be so

clear against him as to warrant no other inference. *Detroit & M. R. R. Co. v. Van Steinburg,* 17 .Mich. 99; *Mynning v. Railroad Co.,* 67 Id. 677. As was said in *Teipel v. Hilsendegen,* 44 Mich. 462:

"The judge takes the case from the jury only when it is susceptible of but one just opinion."

In *Billings v. Breinig,* 45 Mich. 65, Mr. Justice GRAVES, speaking of the showing as to the exercise of due care on the plaintiff's part, says:

"But it was not required that this should be made out by direct evidence. If the occurrence itself, and the surrounding circumstances, after due allowance for conflicting considerations, were capable of breeding an inference of it, and the jury might draw it, in the proper exercise of their function, it was sufficient."

In *Carver v. Plank-Road Co.,* 61 Mich. 593, Mr. Justice CHAMPLIN says:

"In determining the preliminary question of law, it is not the province of the court to pass upon the weight of the evidence, for the sufficiency and weight of evidence, and the effect to be given thereto, is a question exclusively for the jury; and it follows that it is only where there is no legal evidence which, if believed, will establish a fact material to the plaintiff's case, that the trial judge can take the case from the jury."

In *Harris v. Township of Clinton,* 64 Mich. 452, Mr. Justice CHAMPLIN says:

"Upon this issue there are two reasonable but different views which might be taken, and therefore the question should have been submitted to the jury."

When a case is taken from the jury, it cannot be authorized unless upon the strongest case made by any of the witnesses. Courts cannot usurp the functions of the jury. The case must be absolutely free from conflict before it can be taken from the jury. *Marcott v. Railroad Co.,* 47 Mich. 7.

In *Breckenfelder v. Railway Co.*, 79 Mich. 563, Mr. Justice CHAMPLIN says:

"The only negligence or want of care that can be imputed to him is that he did not look west, to see if cars were approaching, before stepping upon the track. Had he done so, he would have seen the box-cars coming, and so near that he could not get across safely. He was neither deaf nor blind, and was in possession of the ordinary faculties of mankind. He was familiar with railroads, and had crossed the road at Adams street for years. He had seen the train pass west. It was passing him, going east, as he was crossing from the west to the east side of Adams street, and had cleared the street as he reached the sidewalk. Was it a natural conclusion, under such circumstances, for a man of ordinary prudence to form, that he might safely cross the track upon the sidewalk as soon as the receding train allowed him to do so, and was he justified, as a prudent man, to act upon such conclusion, without looking to see if there would be danger from other cars following closely after the receding train? * * * It was for the jury to say whether he took that care and caution, under all of the circumstances which surrounded him, that a prudent man, exercising ordinary caution, should have exercised."

In *Little v. Railway Co.*, 78 Mich. 207, Mr. Justice CAMPBELL says:

"The car in question had a few minutes before gone down the west track, and, being behind time, or for some other reason, passed at a much faster rate than usual. * * * He had also a right to expect that the cars would not be run in any unusual way, or carelessly. * * * Defendant introduced no testimony at all, and, in order to convict plaintiff of negligence, it was necessary to assume that he must have heard what other unimpeached witnesses did not hear, or seen what they did not see. To assume, in the face of testimony to the contrary, that there were bells that made such a noise as should have given warning of their coming to all persons, or that the noises of the street must have had no effect in deadening the noise of the car in its approach, is to go beyond the province of the court, and prevent the jury from passing on pertinent facts. That plaintiff

took some precautions is shown affirmatively. It was for the jury to say whether, under all the circumstances, he was so remiss that failure to actually hear or see the car in its approach, so as to avoid it, is his own fault, so as to make him responsible for his own hurt."

In *Detroit & M. R. R. Co. v. Van Steinburg,* Chief Justice COOLEY says:

"In determining this question, we must look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the de'endant, and must concede to him anything which he could fairly claim upon that evidence. He had a right to ask the jury to believe the case as he presented it; and, however improbable some portions of his testimony may appear to us, we cannot say that the jury might not have given it full credence. It is for them, and not for the court, to compare and weigh the evidence. For the purposes of any positive instructions which one party may demand upon the evidence, he must concede all that his opponent may claim from it. He must, therefore, concede in the present case that the 'train came in without sounding any other signal than the whistle which called the station; that it approached the station at a velocity which was unusual.   *   *   *   As a general rule, it cannot be doubted that the question of negligence is a question of fact, and not of law.   *   *   *   Negligence, as I understand it, consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the existing circumstances, in view of the probable danger of injury. The injury [inquiry] is, therefore, one which must take into consideration all these circumstances, and it must measure the prudence of the party's conduct by a standard of behavior likely to have been adopted by other persons of common prudence.   *   *   *   The case, however, must be a very clear one which would justify the court in taking upon itself this responsibility; for, when the judge decides that a want [the exercise] of due care is not shown, he necessarily fixes in his own mind the standard of ordinary prudence, and, measuring the plaintiff's conduct by that, turns him out of court upon his opinion of what a reasonably prudent man ought to have done under the circumstances. He thus makes his own opin-

ion of what would be generally regarded as prudence a definite rule of law. It is quite possible that if the same question of prudence were submitted to a jury collected from the different occupations of society, and perhaps better competent to judge of the common opinion, he might find them differing with him as to the ordinary standard of proper care. The next judge, trying a similar case, may also be of a different opinion, and, because the case is not clear, hold that to be a question of fact which the first has ruled to be one of law. Indeed, I think the cases are not so numerous as has been sometimes supposed in which a judge could feel at liberty to take the question of the plaintiff's negligence away from the jury. The judge, it is said in one case, is not bound to submit to a jury the propriety of a particular course when it is perfectly notorious that all prudent men conduct their own affairs differently. The uniformity of the conduct of business men becomes a rule of law.   *   *   *   It is a mistake, therefore, to say, as is sometimes said, that, when the facts are undisputed, the question of negligence is necessarily one of law. This is generally true only of that class of cases where a party has failed in the performance of a clear legal duty. When the question arises upon a state of facts on which reasonable men may fairly arrive at different conclusions, the fact of negligence cannot be determined until one or the other of those conclusions has been drawn by the jury. The inferences to be drawn from the evidence must either be certain and incontrovertible, or they cannot be decided upon by the court. Negligence cannot be conclusively established by a state of facts upon which fair-m nded men may well differ."

2. If the circumstances are such that reasonable minds might draw different conclusions respecting the fault of the injured party, the plaintiff is entitled to go to the jury upon the facts. *Brezee v. Powers*, 80 Mich. 182; *Teipel v. Hilsendegen*, 44 Id. 461; *Roux v. Lumber Co.*, 85 Id. 519; *Swoboda v. Ward*, 40 Id. 424; *Hagan v. Railroad Co.*, 86 Id. 615; *Adams v. Iron Cliffs Co.*, 78 Id. 271; *Luke v. Mining Co.*, 71 Id. 364; *Billings v. Breinig*, 45 Id. 65; *Railroad Co. v. Van Steinburg*, 17 Id. 99.

3. It is not necessary that the absence of contributory negligence should be shown beyond cavil or question. *Teipel v. Hilsendegen,* 44 Mich. 461; *Billings v. Breinig,* 45 Id. 65.

4. Nor is it the law of this State that, under all circumstances, it is absolutely necessary for a person approaching a railroad crossing to look both ways, and to listen for approaching trains.

"It is what is generally required, but it is not a rule of universal application. Every case must depend upon its own circumstances, and it would be unreasonable to apply such rule, under all circumstances, without regard to the condition of things at the time." *Cooper v. Railway Co.,* 66 Mich. 266.

"He is only required to take such precaution as a ordinarily prudent man would under like circumstances, and whether or not he did use such care is generally a question for the jury." *Richmond v. Railway Co.,* 87 Mich. 380; *Breckenfelder v. Railway Co.,* 79 Id. 563; *Helbig v. Railroad Co.,* 85 Id. 359.

The legal presumption is that a person killed at a railroad crossing did stop and look and listen, and will prevail, in the absence of direct testimony on the subject. *Mynning v. Railroad Co.,* 64 Mich. 93. As was said in *Johnson v. Railroad Co.,* 20 N. Y. 69:

"The natural instinct of self-preservation, in the case of a sober and prudent man, stands in the place of positive evidence."

5. As bearing upon the question of contributory negligence, the right of one person to rely in some measure upon the assumption that another will do his duty has been repeatedly recognized by this Court. *Railroad Co. v. Van Steinburg,* 17 Mich. 99; *McWilliams v. Central Mills Co.,* 31 Id. 276; *Chicago & N. E. Ry. Co. v. Miller,* 46 Id. 532; *Staal v. Railroad Co.,* 57 Id. 244; *Dickinson v. Railway Co.,* 53 Id 47; *Guggenheim v. Railway Co.,*

57 Id. 488; *Klanowski v. Railway Co.*, 57 Id. 528; *Harris v. Township of Clinton*, 64 Id. 447; *Little v. Railway Co.*, 78 Id. 207; *Richmond v. Railway Co.*, 87 Id. 374; *Kinney v. Folkerts*, 78 Id. 697, 84 Id. 619.

In the Van Steinburg case, Chief Justice COOLEY says:

" *Moreover, if the danger depends at all upon the action of any other person under a given set of circumstances, the prudence of the party injured must be estimated in view of what he had a right to expect from such other person; and he is not to be considered blamable if the injury has resulted from the action of another which he could not reasonably have anticipated.*"

In the McWilliams case, Mr. Justice CAMPBELL says:

" A passenger along the sidewalk of a public street has a right to expect some warning before any sudden movement of this kind, and there should be very plain proof of negligence to bind him, under such circumstances."

In that case the track was a spur track, but in this the statute expressly provides that a warning shall be given. Again, in the Staal case, Mr. Justice CAMPBELL says:

" Whether the moving forward, as it was done, was culpably negligent, must depend on what Staal was bound to anticipate. In the absence of any knowledge of what was passing in his mind, we cannot hold him conclusively at fault unless there is no sensible explanation to the contrary reasonably possible. *But he had a right to suppose that defendant would not violate any legal duty, and he could not be bound to suppose it would fail to take reasonable measures to prevent mischief.* And he could not be censured if he acted as seemed proper at the time. The case could not be taken away from the jury, so as to prevent them from giving to either party the benefit of any inference which might be drawn from a comparison of all the facts. If they had found him negligent, their verdict, perhaps, could not have

90 MICH.—39.

been set aside as without support. But they have found otherwise, and we think they had enough before them to make their verdict legally sufficient."

Again, in the Harris case, Mr. Justice CHAMPLIN says:

"It is not a universal rule that the defendant is excused from liability merely because the plaintiff, knowing of the danger caused by defendant's negligence, voluntarily incurs that danger. *If the defendant has so acted as to induce the plaintiff, acting with reasonable prudence, to incur the danger, *  *  *  defendant is liable.* *  *  * The fact that Sopher knew the location of the highway, that it was crooked, that there were no guides or barriers, that it was overflowed, and the water had raised since he last passed over it, and knew that some hazard was incurred in attempting to pass over it, did not conclusively show that it was negligence in him to make the attempt."

Again, in the Marcott case, Mr. Justice CAMPBELL says:

"If the signals were not given, there was a distinct violation of law, which we cannot, as matter of law, say had no effect on the result."

In the Guggenheim case, referring to the testimony, Mr. Justice SHERWOOD says:

"But the question presented is, does it not, standing alone and taken as true, show, or tend strongly to show, that the defendant was negligent in passing the crossing and coming around the curve, with its train off of time, at the rate of speed that it did, and without giving any of the signals or warnings whatever, required by statute, or otherwise? I think it does; and, if that is the correct conclusion, then I apprehend there can be no question but that the case should have been submitted to the jury. From the testimony above stated, it appears that the plaintiff had good reasons to believe that no train was approaching, and that he could make the crossing in safety. Certain it was that, had the train been slowed down ten seconds, he would have passed the fatal spot

in safety; and it is almost conclusively to be presumed from the facts stated that, had the whistle been sounded or the bell rung for the crossing, the deceased would have heard it, and delayed crossing until he could have done it without injury. *The negligence of the defendant, which could not have reasonably been anticipated,* should not be allowed to impose a degree of care and diligence upon the deceased unknown to the law, and which would not have been required if ordinary attention and prudence had been exercised by defendant."

In the Guggenheim case (second hearing), Mr. Justice Morse says:

" *When the railroad company is required to sound an alarm, or is in the habit of blowing whistles and ringing bells, it seems to me that the traveler in the highway has a right to rely somewhat upon the observance of this custom or duty.* * * * *He was not bound to look and listen as carefully as he would have been had a train been due, and the time of its coming been known to him. This is good law.* The precaution that Manheimer was bound by the law to take was the care that an ordinarily prudent man would have exercised under like circumstances. The ordinarily prudent man looks and listens before he crosses a railroad track, but he does not look or watch as closely when he has reason to believe that no regular train is due or coming as he does when he knows that one may be expected at once at the crossing."

In the Klanowski case, Mr. Justice SHERWOOD, referring to the statutory duties of the company, says:.

"Such duties cannot be neglected or omitted with impunity. If they are, and an injury to persons or property occurs by reason thereof at such places, the company will be liable; and although the party injured under such circumstances, by his acts, or omissions to act, *induced by the negligence of the company,* may be guilty of some faults which contributed to the injury complained of, such fault ought not to be permitted to avail the company in making defense against their wrongful acts, unless it was willful, or so gross as to render it equally inexcusable. *Any other rule would allow the company to take advantage of its own wrong in avoiding its statutory liability.* * * * Many times the train

runs much stiller than at others, in consequence of the condition of the atmosphere, and other causes. In all cases, persons, except those in charge of the train, are liable to be deceived in the speed of the train; and in no case is the exact time when the engine reaches the crossing known to others than the engineer  For these and many other reasons which might be given, no other safe rule. can be adopted. No less than the giving of every warning the law exacts should be held sufficient to shield the company from liability for damages arising from injuries received at such places. Safety to the lives of those traveling upon the cars, as well as to those traveling in vehicles upon the highway, requires this. *All persons have a right to expect and rely upon the full performance by the company of all the requirements and duties imposed upon it by the law* under which it alone· is allowed to exist and do business; and it is not unfrequently impossible to ascertain with any degree of certainty how far the neglect of the company to give the required warnings at highway crossings may have been relied upon by a person in regulating and determining his action in approaching the track, where a collision and injury occurs, resulting in his immediate death. Usually the circumstances surrounding the accident have to be relied upon in determining the question, and such action on the part of the injured party should never, in this class of cases, be allowed to control the verdict of jurors, unless it satisfactorily appears to have been very gross, or wantonly negligent and careless."

In the Miller case, Chief Justice MARSTON says:

"A stricter rule should not be held here than in criminal cases, where the right of one in apparent danger to act upon circumstances as they appear to him at the time is well settled; and, although subsequent investigation may show that he erred, yet that alone will not make him criminally responsible. If the neglect of the company to sound the whistle when approaching the highway permitted the plaintiff to drive into a dangerous position, under circumstances which allowed him no time for calm reflection, and he, acting upon the spur of the moment, in his efforts to avoid the danger, made a mistake, and took what subsequent, cool, deliberate investigation may show to have been wrong, and that some other course would have been better, if not abso-

lutely safe, yet he cannot be charged with contributory negligence because of such error of judgment, under such dangerous circumstances. This is the rule in both civil and criminal cases, sustained by an abundance of authority, if any, indeed, were needed."

In the Dickinson case, Chief Justice COOLEY says:

" Plaintiff had a right to assume that the defendant would perform its duty in guarding the safety of its passengers and servants; and it is only because it had failed to do so in this instance that the danger was encountered."

In the Little case, Mr. Justice CAMPBELL says:

" Plaintiff hand also a right to expect that the cars would not be run in any unusual way, or carelessly."

In the Richmond case, Mr. Justice MORSE says that plaintiff's intestate could not have seen the approaching cars until after he reached a point 20 feet from the crossing, and,—

"If he had looked then, he would have undoubtedly seen these cars in time to have stopped and avoided a collision. And it is pretty apparent—almost absolutely certain, from the plaintiff's own showing—that he did not look south within said 20 feet, until his horse was upon the track. Whether he was negligent depends in a great measure upon whether or not he had a right to rely, under the circumstances, upon the absence of the flagman, and the lack of any signal of danger from him."

The court in that case was asked to instruct the jury that the absence of the flagman from his post did not in the least excuse the deceased from exercising his senses of sight and hearing to ascertain whether the train was approaching, and that if the deceased by looking up the track, could have seen the. train in time to avoid the injury, his omission to do so was such negligence as would prevent a recovery. This the court refused to do, but left it to the jury to determine whether, under the circumstances, the deceased had a right to rely, and how

far, upon the absence of the flagman from his post of duty, and the want of any signal of danger from such watchman, as an assurance of safety; and this Court approved the course taken.

In *Kinney v. Folkerts* this Court said:

"If the defendant, by his own act, has thrown the plaintiff off his guard, and given him reason to believe that vigilance was not needed, the lack of such vigilance on the part of the plaintiff is no bar to his claim. If the statement of the plaintiff is a true one, he was thrown off his guard, and it was for the jury to say whether an ordinarily prudent man would have done as he did under like circumstances."

It was said in *Engel v. Smith*, 82 Mich. 7, that—

"It is a sound rule of law that it is not contributory negligence not to look out for danger where there is no reason to apprehend any."

In *Thomas v. Railway Co.*, 8 Fed. Rep. 732, it was held that—

"It was correct to instruct the jury that he [plaintiff's intestate] had a right to assume that the defendant would use more care, in view of the obstructed condition of the crossing, than ordinary. The law will never hold it imprudent in any one to act upon the presumption that another, in his conduct, will act in accordance with the rights and duties of both." Citing *Newson v. Railroad Co.*, 29 N. Y. 383; *Liddy v. Railroad Co.*, 40 Mo. 506; *Langhoff v. Railway Co.*, 19 Wis. 515; *Hegan v. Railroad Co.*, 15 N. Y. 383; *Railroad Co. v. Ogier*, 35 Penn. St. 60, 72.

The court say further:

"But assuming that the deceased saw the approaching train 60 rods from the crossing, as he was preparing to cross, it would have been error to instruct the jury, as requested, that he was guilty of contributory negligence if he did not stop to see if he could cross safely just as he emerged upon the track from behind the empty car upon the side track. *Kellogg v. Railroad Co.*, 79 N. Y. 72. The jury were at liberty to find, if the train had

been approaching at ordinary speed, there was ample time for the deceased to cross in safety. As the result proved, if the train had been running at 20 miles an hour instead of 40, indisputably there would have been ample time. It is not negligence *per se* to cross a track in front of an approaching train."

In *Piper v. Railway Co.*, 77 Wis. 247 (46 N. W. Rep. 165), the court say:

" There is evidence tending to prove that at the time of the accident the train was from 15 to 20 minutes behind its regular time.     *     *     *     The conductor testified that he ran a distance of 6 miles in 10 minutes, which would be 900 feet in 17 seconds.     *     *     * The particular conduct of the plaintiff complained of is his failure to look in the direction of the coming train after reaching a point within 50 feet of the crossing. He testified that he did look in that direction when between 50 and 60 feet from the crossing; and other testimony tends to prove that, from the point where he so looked, he could have seen the train, had it then been anywhere within at least 900 feet.     *     *     *     Assuming that testimony to be true, as we must on this appeal, and it follows conclusively that while the plaintiff was passing over the 50 or 60 feet the train passed over at least 900 feet.     *     *     *     This court has held, in effect, that where a traveler on a public street in a city approaches a railway crossing, and nothing appears to the contrary, he may properly assume that a train is moving at a lawful rate of speed, and, if it transpires that such speed was unlawful, that fact may be taken into consideration in considering the question of contributory negligence.     *     *     *     *     *     *     *     *     *
" It is claimed as a matter of law that the plaintiff was not excusable, upon any theory, from omitting to look eastward along the track after getting within 50 feet of it, since every step of the team forward enabled him to see for a greater distance in the direction of the approaching train, and since his horses were perfectly gentle, and might have been stopped at any instant. But it is to be remembered that the plaintiff may have been lulled into a sense of security by thus failing to see the train when he did look; so that, under all the circumstances stated, we are unable to say, as a matter of law,

that the momentary diversion of the plaintiff from looking in the direction of the coming train by reason of the conduct of his horses was not excusable." *Butler v. Railway Co.*, 28 Wis. 487; *Bower v. Railway Co.*, 61 Id. 457 (21 N. W. Rep. 536); *Ferguson v. Railroad Co.*, 63 Id. 152 (23 N. W. Rep. 123); *Winstanley v. Railway Co.*, 72 Id. 375 (39 N. W. Rep. 856); *Duame v. Railway Co.*, 72 Id. 523 (40 N. W. Rep. 394); *Kellogg v. Railroad Co.*, 79 N. Y. 72.

In *Allen v. Railroad Co.*, 82 Me. 111, 117 (19 Atl. Rep. 105), held, that plaintiff had a right to rely upon the train's approaching the crossing at a rate of speed not exceeding that allowed by law.

In *Railroad Co. v. Ogier,* 35 Penn. St. 60, 71, the court said:

"The theory that the deceased might have seen 623 feet along the railroad in the direction in which the train was approaching, from a point at which he might have stopped the progress of his horse, and escaped danger, but did not see it until within 174 feet of him, if considered abstractly, and entirely unshaken by any or every other consideration, would have presented a strong case of negligence; but even then it would scarcely have justified a court in saying there was negligence, as a matter of law, when but 17 seconds were allowed for action to the party in danger."

In *Jones v. Railroad Co.*, 128 U. S. 445 (9 Sup. Ct. Rep. 118), Mr. Justice MILLER says:

"On the other hand, there is some testimony to show that the plaintiff ran carelessly through the depot, that he knew the train was approaching, and that he might have guarded himself against it if he had stopped at the exit of the depot long enough to have looked about him. But we think these are questions for the jury to determine. *We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others.* There is nothing in a case in which it is conceded, fully and unreservedly, that the defendant company is in fault on account of the manner of running its trains, such as the high

rate of speed and other careless matters mentioned by the court in its instructions, which should justify the court in refusing to submit to the jury the question whether the defendant company is relieved from the liability incurred by it, by reason of the acts of the plaintiff showing that, in some degree, he may not have been as careful as the most cautious and prudent man would have been. Instead of the course here pursued, a due regard for the respective functions of the court and the jury would seem to demand that these questions should have been submitted to the jury, accompanied by such instructions from the presiding judge as would have secured a sound verdict."

In *Improvement Co. v. Stead*, 95 U. S. 167, the court say:

" But as this was not a regular train, or on usual time, the same degree of caution would not be required on his [plaintiff's] part, or such as if it were a regular train and on usual time."

Referring to a request to charge, Bradley, J., says:

"It states such duty with the rigidity of a statute, making no allowance for modifying circumstances, or for accidental diversion of the attention, to which the most prudent and careful are sometimes subject, and assuming, in effect, that the duty of avoiding collision lies wholly, or nearly so, on one side.   *   *   *   The right of precedence does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach. The duty of the wagon to yield precedence is based upon this condition."

In *Parsons v. Railroad Co.*, 113 N. Y. 363 (21 N. E. Rep. 146), after referring to the rule as to the exercise of care by persons crossing railway tracks, the court say:

" But the duty of active vigilance must be adapted to the circumstances of the case; and if the offending company has by its own conduct, and by its published regulations, led the public to believe that trains would

not be run on its tracks at specified times and places, persons having occasion to cross them have the right to rely on the assurance of the company, and are not necessarily guilty of negligence when injured by prohibited trains while doing so. The deceased was justified in supposing that no rapidly moving train would come into the station while he remained in the yard, and was engaged in communicating with his friends on the west side. He had frequently done so before, and had been lulled into a sense of security by the immunity which he had before enjoyed, and the reliance which he placed upon the care exacted of its servants by the railroad company.   *   *   *   Having once looked, and seeing no train, he had a right to assume that none would be coming at such a rate of speed as would preclude him from crossing a single track. It is probably true that, if he had looked both ways at the moment of stepping upon the track, he could have seen the approaching train; but that might be said of almost every accident of a similar character, and is a degree of vigilance seldom adopted by any one, and would require the impossible feat of looking in opposite directions at the same time, or anticipating the point from which he was to be assailed. The law does not require this; neither is there any rule which will defeat a recovery in cases of this kind merely because it was possible for an injured person to discover an approaching train. The law does not forbid persons from crossing railroad tracks, or impose upon them exclusive responsibility for damages incurred in making such an attempt. The question is whether the injured party, under all of the circumstances of the case, exercised that degree of care and caution which prudent persons of ordinary intelligence usually exercise under like circumstances. This rule must in all cases, except those marked by gross and inexcusable negligence, render the question involved one of fact for the jury."

In *Weber v. Railroad Co.*, 58 N. Y. 451, the court held that, while the vigilance and caution required of the traveler must be proportioned to the known danger, it is also, in a measure, limited by the usual and ordinary signals and evidences of danger.

In *Voak v. Railway Co.*, 75 N. Y. 320, held, that if

plaintiff was lured on by the failure of the company to give warning, without fault on her part, to a place of danger, she was entitled to recover.

In *French v. Railroad Co.*, 116 Mass. 537, as plaintiff approached the crossing, a freight train was passing; and, after the last car passed, she attempted to cross. She was driving with care, and watching the road. She heard no signal, received no warning that other cars were coming, and saw no flagman. At a point 46 feet from the center of the track, she could have seen up the track 46 feet; and, at a point 30 feet away, she could have seen a long distance. She did not look in that direction when she reached these points, and gave as a reason that she did not suppose that one train would follow another so closely. The court say:

"Whether the plaintiff was in the exercise of that due care which persons of common prudence and intelligence would exercise when placed in a similar situation, and whether she was careless in failing to look up the track at the points near the crossing where it was visible, was a question for the jury." Citing *Wheelock v. Railroad Co.*, 105 Mass. 203; *Allyn v. Railroad Co.*, Id. 77; *Chaffee v. Railroad Co.*, 104 Id. 108.

The circumstances referred to in all of the railroad crossing cases cited are the absence of warning, the unusual rate of speed, and the fact that the train was behind time. These are considerations which must of necessity enter into the determination of the question of negligence. As is said by Chief Justice CAMPBELL in *Strand v. Railway Co.*, 64 Mich. 219:

"The conduct of a person under such circumstances cannot be severed from the circumstances themselves."

In the present case, there was a combination of all of these circumstances, and, in addition, the highway was within 636 feet of a station.

In *Apsey v. Railroad Co.*, 83 Mich. 432, deceased saw

the train approaching, and whipped up his horses to get across the track. The same is true in *Underhill v. Railway Co.*, 81 Mich. 43.

*Guta v. Railway Co.*, 81 Mich. 291, and *Pzolla v. Railroad Co.*, 54 Id. 273, arose within the limits of a city, where whistle blowing was prohibited. In the former case, plaintiff saw an engine sidetracked for the purpose of allowing another train to pass; and in the latter the proofs show that plaintiff was looking in the direction of the train, and deliberately walked upon the track, in the face of it.

In *Matta v. Railway Co.*, 69 Mich. 109, and in *Mynning v. Railroad Co.*, 67 Id. 677, the parties approached the track with their heads down, utterly indifferent as to their surroundings.

In *Freeman v. Railroad Co.*, 74 Mich. 86, the parties were intoxicated.

In *Brady v. Railroad Co.*, 81 Mich. 616, the view was obstructed so that plaintiff could not see the approach of a train until within 20 feet of the track. The train was due, and plaintiff knew it. One of his horses objected to crossing, and he urged the horse across.

*Gebhard v. Railway Co.*, 79 Mich. 586, arose within the city of Detroit. It does not differ from the Breckenfelder case, except perhaps in the ample knowledge which Gebhard possessed of the use of the tracks.

In *Potter v. Railroad Co.*, 62 Mich. 22, the track for some 40 or 50 rods was in plain sight. There was no showing of unusual speed, but the blowing of the whistle started plaintiff's horses. Plaintiff made no effort to check them, but attempted to get across the track before the engine reached him. *Rhoades v. Railway Co.*, 58 Mich. 263, was a similar case.

In *Haas v. Railroad Co.*, 47 Mich. 401, the Court found that the crossing signals were in fact given. There was

no claim that the train was late or was running at any unusual rate of speed.

*Kwiotkowski v. Railway Co.*, 70 Mich. 549, arose within the city limits. The only negligence charged was the high speed of the train. Deceased was on foot. It was at night. The head-light of the train lighted the track for at least a block. The Court in that case say there was nothing to distract or confuse his vision.

In the recent case of *Cahill v. Railway Co.* (Ky.), 18 S. W. Rep. 2, the railroad track was, for a considerable distance south of the crossing, straight, and, in the opinion of some witnesses, a train coming from that direction could be seen 400 yards away from a point on the roadway 100 feet from the crossing. But the train was a passenger train, behind time, and running at a high rate of speed. Whether plaintiff, before going on the track, looked or listened for a coming train, does not appear. The plaintiff was upon a private crossing, near a public crossing. Speaking in respect to persons on such private crossing, the court say:

"And so they have the right to act upon the presumption the company will duly comply with every legal requirement that may affect them in the reasonable use of such crossing. Therefore, if a person of common prudence and intelligence, who distinctly and habitually hears signals of approach of railroad trains to a public crossing, that he knows it is both the duty and custom of the company to give, *would ordinarily rely on such signals* in the use of his own private crossing, then he should, in law as well as in fact, have benefit of them; otherwise, his would be the case of a person injured while in the reasonable exercise of a legal right, yet without remedy against the wrong-doer or person in fault. As a matter of fact within common observation, persons living in the vicinity of a railroad generally keep informed about regular movement of trains, and those of them near enough to hear the customary sound of the steam-whistle for a public crossing do rely upon it as a signal by which to regulate use of their own

private passway over it. And we see no reason why they
may not rightly and prudently do so; for nothing more
is thereby exacted or assumed by them than simple per-
formance by the railroad company of a legal duty already
prescribed for safety of those using the public crossing
that incidentally and naturally operates for their own.
And when the legal obligation is coupled with cus-
tomary performance of the duty of giving such signals,
*a double assurance is afforded that all who hear may rely
on them;* and in fact they are as implicitly, and may be
as certainly and safely, relied on, by those hearing them,
at a private as at the public crossing for which they are
given. To so allure a person to go on the railroad track
at his private crossing, and then exempt the company
from liability for injuring or killing him, upon the fallaci-
ous and deceptive theory that, in legal contemplation,
signals, though inevitably heard beyond, are for the sole
benefit of those at, a public crossing, would be without
reason and justice. The law sets no such bounds to the
liability of a person violating it, nor does it thus curtail
the remedy of one injured by the violation.   *     *     *
It is not contended the plaintiff was negligent in any
respect, except failing to look for a coming train before
going upon the railroad. Whether either she or Henry
Conrad did so look could not, for the reason before
indicated, be shown by direct testimony. Therefore, it
was the peculiar province of the jury, not of the court,
to determine that question from facts and circumstances
proved; for, whatever may be the rule elsewhere, it has
been definitely settled by this court that it is not to be
presumed, in the absence of evidence as to the care exer-
cised by a person injured or killed on a railroad where
he had the right to be, that he recklessly or carelessly
imperilled his own life.   *     *     *     But to decide that
failure of a person to look along a railroad before
attempting to cross it is, under all circumstances and
necessarily, negligence, would be arbitrary and without
reason; for there may be evidence sufficient to satisfy a
person of ordinary carefulness the track is clear, without
taking that precaution, as when he knows it is not usual
train-time, and does not hear the signal he knows it is
customary for the company to give and him to hear.
A person thus reasoning and acting, it seems to us, can-
not, upon principle, be regarded as negligent, even if
he does fall short of the measure of vigilance needed to

prevent being injured by a passenger train running hours behind time, at an extraordinary rate of speed, and with-out any signal of its approach."

In *Studley v. Railroad Co.* (Minn.), 51 N. W. Rep. 115, plaintiff's intestate was on foot. She died from the injuries received. The presumption as to the exercise of reasonable care was removed by affirmative proof that she turned her head, and looked towards the train as it approached, in ample time to avoid the danger; and, too, the court say that it would seem quite certain that deceased must have been overtaken while between the crossings and a trespasser upon defendant's right of way, and that as to whether the bell was rung or the whistle sounded "the preponderance of the evidence was decidedly with the defendant."

In *Carney v. Railway Co.*, 46 Minn. 220 (48 N. W. Rep. 912), plaintiff went to the depot "for the purpose of meeting the incoming train."

In *Clark v. Railroad Co.* (Minn.), 50 N. W. Rep. 365, plaintiff expected the train, and walked upon the track, notwithstanding his view was obstructed, until he reached a point six feet therefrom.

In the present case, in order to determine whether Grostick was negligent, several questions must be answered. This highway was but 636 feet west of Howell station. There were three highway crossings within a space of 350 feet. The train was behind time. How much behind time? Did Grostick know that this train had not passed? The presumption is that he did not. The train was running at an unusual rate of speed. The steam had been shut off at the cut. The train was on a down grade of 37 feet to the mile. The brakes had not been applied. It had the momentum of a train which had, according to defendant's testimony, made up 3 minutes in $8\frac{1}{2}$ miles. What was the rate of speed at

which it was running? How many seconds had elapsed
after the train had left the cut, before it reached East
street,—15 or 17 or 20? Perhaps less than either. How
far was Grostick from the track when the train left the
cut,—20 or 25 or 40 or 50 feet? Was the station whistle
given? Did Grostick hear it? If so, from which direc-
tion did he expect the train? Had he looked to the
west 15 or 17 or 20 seconds before the collision, and
seen no train, and then, the view to the east being
obstructed by elevator, engine-house, and depot,—the
engine-house and station being but from 12 to 15 feet
north of the track,—had he become anxious, and turned
his attention specially to the east? Would not the very
fact of obstructions of the view to the east distract his
attention from the west? Would not an ordinarily pru-
dent man have expected that some warning would be
given before a train from the west would come down
upon him? Is it fair to measure Grostick's conduct by
the knowledge possessed by those who expected the
train, who knew that it was late, whe saw the smoke of
the steam whistle? We must measure the prudence of
Grostick's conduct by a standard of behavior likely to
have been adopted by other persons of common prudence.
The very fact that in the presence of all of these men
at the station, and of these witnesses, some of them but
100 feet from the place of collision, no one raised a
hand or gave other warning, bears upon the question of
the time which elapsed after the train came in sight, and
before the collision. And, too, the conduct of the horses
bears upon the question of the sudden approach of
this train. Was Grostick bound to anticipate that this
train would come when it came, at this rate of speed,
and without warning? There is no testimony tending
to show that Grostick was not a prudent and careful
man, nor is it claimed or intimated by any one that

he was not at the time in the possession of all of his faculties. Indeed, the testimony of one witness, who saw him from the north, is that he was looking towards the track; and two other witnesses, who saw him as he drove upon the track, say that he was looking east, as though expecting a train from that direction. Here is positive, affirmative, and uncontradicted testimony as to carefulness. Had he been looking west, and been struck by a train from the east, the same charge would be made. Is this affirmative testimony to be overcome by an inference predicated upon a surmise, or upon facts the force of which is materially affected by surrounding and attendant circumstances and distracting conditions? If this train had not been behind time, Grostick would not have been injured. If it had not been running at an unusual rate of speed, Grostick would have crossed in safety. If it had given an alarm, Grostick would not, in all human probability, have attempted to cross.

The rules laid down in the cases cited have been formulated in recognition of the fact that prudent men do rely upon the performance by railroad companies of the duties imposed by statute. As was said in the Marcott case, in the Guggenheim case, and in the Klanowski case,—

"If the signals were not given, there was a distinct violation of law, which we cannot, as matter of law, say had no effect upon the result."

A saw-mill is a place of danger, yet one entering upon employment therein may assume that the employer has done his duty respecting proper appliances and the good order of the machinery. If the rule and custom is to blow the whistle before starting the machinery, he may rely upon the observance of that rule. An elevator is a

place of danger, yet one entering it may assume that the
proprietor has done his duty. An engineer, upon enter-
ing his cab, has a right to assume that bell and whistle
have been provided and are in good order. A railroad
track cannot be said to be always a place of peril. A
traveler crossing the tracks upon a highway is not there
by invitation, but is there as a matter of right. The
company has no exclusive right over the highway. Its
right to precedence depends upon compliance with stat-
utory provision. The ordinary highway is a place of
danger, but the butcher's boy or the hackman cannot
increase the peril, and then excuse his indifference to the
rights of travelers on foot by setting up their failure to
take extraordinary care in view of the fact that the
butcher's boy or hackman usually drives through our
streets as though pedestrians had no rights. The standard
of care required of persons lawfully upon a highway
ought not to be elevated, in view of possible perils occa-
sioned by unlawful use of such highway, or to excuse
those making such unlawful use. The Legislature
imposes the duty of warning upon railway companies to
protect the public. This duty is created by a public
need. The statute cannot be said to be for the protec-
tion of careless people only. It presumes danger, in the
absence of signals, to persons exercising ordinary care.
This duty is imposed because of the standard of behavior
that exists, and if a higher standard is required than
that which gave rise to the statute the statute is a dead
letter, and may be violated with impunity. To lay down
the arbitrary rule that persons crossing a railway track
must look and listen in all cases where it appears that,
if such persons had looked, they would have seen the
train, or there can be no recovery, would be to make
the question of what is reasonable care in a given instance

depend, not upon whether it was that ordinarily observed by prudent men under like circumstances, but upon a judicial enactment fixing a standard of care predicated upon the opinion of the court as to what ordinarily prudent persons ought to do, rather than upon what they actually do. In this class of cases, to enable the court to say as a matter of law that the plaintiff was guilty of contributory negligence, there must be but one exclusive inference from the facts shown.

In the case of *Parsons v. Railroad Co.*, 113 N. Y. 364, the court say:

"The question is whether the injured party, under all of the circumstances of the case, exercised that degree of care and caution which prudent persons of ordinary intelligence usually exercise under like circumstances. This rule must in all cases, except those marked by gross and inexcusable negligence, render the question involved one of fact for the jury."

In other words, before the court is warranted in taking the case from the jury, the conduct of plaintiff must appear to have been palpably inexcusable. It must have about it the elements of recklessness or disregard of consequences. There was no error in the refusal of the court to take this question from the jury.

The case, however, must be reversed upon other grounds. The court instructed the jury that—

"If you find from the evidence that he did listen and look, and had no notice by sight or hearing, and if you find that no whistle was twice sounded, no bell rung, and that he had no notice by sound of rumbling train, or smoke, and ventured to cross, and that, while crossing, his danger was seen or known by the employés of the defendant at a sufficient distance from the road crossing to enable them to slacken the speed of the train, or even to stop it, and that it was not done, that would be gross negligence on the part of the defendant in running its train, and it would not be thereby excused from liability."

"It would be gross negligence on the part of the engi-

neer, if he saw the deceased approaching the said crossing on the said highway, not to have sounded the whistle or rung the bell, and not to have slackened the speed of his train, and done everything in his power to avoid the collision, after seeing the said Grostick, if you find he saw him, and if he could have slackened the speed of the train and have avoided the accident."

The declaration does not charge defendant with gross negligence, or that Grostick was seen or his danger known to defendant's employés, or that, knowing or seeing his danger, they wantonly neglected to blow the whistle or stop the train. The court further charged—

"That, under the general statutes of this State, it is the duty of every railroad corporation owning and operating a railroad in the State to comply with the provisions of law as enacted by the Legislature; that, in constructing and making its road-bed and track over and across the public highway (which highway is then and there in use by the public as such), to restore the highway to its former condition as nearly as possible, and to construct and maintain thereafter reasonable, suitable, and safe crossing for the passage of persons and teams traveling along the highway, over and upon said crossing."

"And the further fact that the road-bed and track of defendant's said road was about seven feet above the level of the said highway and the natural earth's surface of the surrounding lands may also be considered by you in determining the nature and character of the said highway crossing, and the degree of skill, care, and diligence and precaution thereby imposed upon the defendant in consequence thereof. And the said surrounding circumstances of the said highway crossing imposed upon the engineer and fireman then and there in charge of the defendant's said engine a greater degree of care in regulating the speed of said train in approaching and crossing the said highway, and in keeping a careful and continuous watch from the lookout upon the cab of said engine, for the approach of teams and vehicles approaching the said crossing, upon, over, and along the said highway, than if the said highway had been an ordinary highway crossing."

There was no testimony tending to show that the highway at this crossing had not been restored to its former condition, as nearly as possible, or that the defendant had failed to construct and maintain a reasonably suitable and safe crossing at this point, nor was the neglect to keep a careful and continuous watch from the lookout upon the cab set out in the declaration.    The road-bed of the highway had been raised to the level of defendant's road-bed, and the approach was gradual.    There was no claim made that the width of the road-bed of the highway had anything to do with the accident, or furnished a reason why plaintiff's intestate should have hastened to cross.

These instructions were clearly erroneous, and the judgment should be reversed, and a new trial had, with costs to defendant.